**Betty FERGUSON, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 91–CV–1523.**

District of Columbia Court of Appeals.

Argued March 10, 1993.

Decided July 26, 1993.

Michael J. Miller, for appellant.

Edward E. Schwab, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee.

Before STEADMAN, FARRELL and KING, Associate Judges.

STEADMAN, Associate Judge:

In early 1989, following five unsuccessful pregnancies, Betty Ferguson again became pregnant. She went to the emergency room at D.C. General Hospital on June 12 and June 17, 1989, complaining of abdominal pain and cramps, and was treated on an outpatient basis. She returned to the hospital on June 18, 1989, with the same complaints. Approximately one-half hour after arriving at the hospital, a fetus weighing eleven ounces emerged from Ms. Ferguson. Upon emergence,[1] the fetus had a heartbeat and engaged in some form of respiratory effort. Within a short time, however, these functions ceased and the fetus died.

Ms. Ferguson brought this action in Superior Court against the District of Columbia ("the District") on behalf of the fetus under the local survival statute, D.C.Code

1. We use the word "emergence" as a neutral term to describe what appellant calls a "birth" and appellee calls a "miscarriage."

§ 12-101 (1989).[2] The complaint alleged that the employees of D.C. General Hospital, which is owned by the District, were negligent in failing to admit her to the hospital and in failing to provide the treatment necessary to prevent her fetus from emerging prematurely.[3] As legal representative of the fetus, Mrs. Ferguson sought recovery for the damages suffered by the fetus as a consequence of that negligence, including its death. The District moved for dismissal or in the alternative for summary judgment on the ground that the fetus was not viable and therefore had no cause of action under the survival statute. The trial court granted the motion for summary judgment.[4]

Appellant presents two arguments in seeking reversal of the summary judgment: first, that because the fetus emerged alive, a cause of action existed under the survival statute regardless of whether or not the fetus was viable; second, to the extent that viability is relevant, the fetus's viability was a disputed issue of fact preventing the grant of summary judgment. We think existing case law mandates the rejection of both arguments on the record before us and accordingly we affirm the judgment.

## I.

We first address appellant's argument that because the fetus emerged alive a cause of action existed under the survival statute. In *Greater Southeast Community Hosp. v. Williams*, 482 A.2d 394 (D.C. 1984), this court traced at length the common law background and laid out the general principles operative in this jurisdiction with respect to the application of the sur-

vival statute to injuries inflicted upon an unborn fetus. We adopted the rationale of the landmark case of *Bonbrest v. Kotz*, 65 F.Supp. 138 (D.D.C.1946), as the law of this jurisdiction, thus recognizing the right of a viable fetus, as an "independent person," to be free of prenatal tortious injury and to recover for injuries inflicted while viable. We concluded that since a viable fetus is a person with a right of action within the meaning of the survival statute, there is no difference, for purposes of liability, whether injuries inflicted upon the fetus subsequent to its becoming viable cause the death of the fetus just prior to or just after birth. In doing so, we specifically rejected the argument that live birth, rather than viability, should be the "logical line defining fetal rights." *Williams, supra,* 482 A.2d at 398. Thus, the statute was held applicable to a viable fetus that was stillborn as the result of the alleged malpractice.

We revisited this area of the law in *Jones v. Howard University*, 589 A.2d 419 (D.C.1991).[5] In that case, a mother of twins was exposed to a diagnostic x-ray and surgery during her first trimester of pregnancy and sought damages for the mental distress and anxiety that she experienced over the potential injury to her unborn fetuses, claiming that the hospital and the doctors were negligent in failing to first ascertain that she was pregnant.[6] Applying our requirement that absent any physical injury a plaintiff must be within the "zone of physical danger" to recover for the negligent infliction of emotional distress, we concluded that the mother

---

2. That section reads: "On the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased."

3. No claim was made that the death of the fetus was due to insufficient care by hospital personnel after the emergence of the fetus.

4. In addition to the claim under the survival statute, both parents sought damages in their own right. The grant of summary judgment on these other counts is not contested on appeal.

5. Several years before *Jones,* we recognized the distinction between injuries to a viable fetus and injuries to the mother, making clear that the mother has a cause of action for her own injuries quite apart from those that the fetus might have for injuries to it under *Williams. See Coughlin v. George Washington Univ. Health Plan, Inc.,* 565 A.2d 67 (D.C.1989).

6. The twins were subsequently born healthy in all respects.

could recover if she showed that the radiation or surgical treatment presented a threat to her own health *or* that of the unborn twins. In doing so, we concluded that any injury to the non-viable twins was an injury to the mother herself:

> We take the view that to authorize the mother to pursue, in her own right, claims for injury to a non-viable fetus represents a more orderly approach to the adjudication of such claims than does a requirement that such claims be pressed as wrongful death and survival claims.

*Id.* at 423. Thus, we established that during the period of non-viability, the cause of action pertained to the mother and not to the non-viable fetus.[7] Since, as *Williams, supra,* 482 A.2d at 395, demonstrated, a pre-existent cause of action is a sine qua non to the application of the survival statute, the statute necessarily could not apply while the fetus remained non-viable.[8]

■ Appellant attempts to distinguish these cases by arguing that if a non-viable fetus is "born alive," which she asserts is the case here, that fact should be decisive for purposes of the survival statute. We think that this approach is foreclosed by the reasoning of *Williams,* where we expressly rejected live birth as the line in determining fetal rights. Just as a viable fetus that is injured possesses rights under the survival statute whether death occurs prior to or subsequent to birth, likewise,

the existence of rights *vel non* of a non-viable fetus under the survival statute cannot turn on that happenstance either.[9] The concept underlying our survival statute is that the representative is merely bringing a lawsuit that decedent could have brought had he or she not died. Where the fetus emerges from the mother without the developmental capacity to survive, it would contradict the theory of a survival action to provide a cause of action to the representative of the fetus. Absent clear indication of contrary legislative intent, it would be anomalous to view an action as one that could have been brought by the fetus had the fetus not died when the fetus had never developed the capacity to survive in the first place. Indeed, the logic of viability rather than physical emergence of the fetus as the dividing line in interpreting the survival statute is inherent in the concept of viability itself, an issue to which we now turn in dealing with appellant's second argument.

## II.

Appellant argues that even if viability is the correct line in determining when a cause of action on behalf of the fetus exists under the survival statute, the question of whether the fetus here was "viable" was a disputed question of fact that precluded the grant of summary judgment.

Appellant argues that because the fetus was "born alive," that is, with a heartbeat,

---

7. We had recognized this same dichotomy in *Coughlin, supra* note 5, 565 A.2d at 70–71 n. 3, where we observed that *Williams* had left open the question "whether an independent cause of action exists for injury to a nonviable fetus; whether such an injury would be to the woman and, thus, the cause of action hers; or whether no cause of action accrues."

8. In both *Williams, supra,* 482 A.2d at 396 n. 2, and *Jones, supra,* 589 A.2d at 423 n. 8, we left open the issue of whether a person born subsequent to surviving an injury incurred as a non-viable fetus can later bring an action for damages for such injury. We necessarily contemplated that at that later point, the person would have reached the point of viability; so understood, the issue continues to remain open.

9. The only extant case on this exact point of which we are aware is presently pending after argument before the Supreme Court of Pennsyl-

vania. *See Hudak v. Georgy,* 390 Pa.Super. 14, 567 A.2d 1095 (1989), *appeal granted,* 525 Pa. 600, 575 A.2d 566, (1990). In that case, three fetuses were delivered by caesarean section. Two died within minutes of birth and the third was placed on a respirator but died the next day. The parties stipulated that the fetuses were non-viable, understood to mean "incapable of living outside the womb because of immaturity." *Id.* 567 A.2d at 1096. The intermediate appellate court, recognizing that recovery lay in Pennsylvania under its survival statute for a viable fetus even though stillborn, determined that in the absence of any case law supplying a principle that could justify an extension of the statute to encompass non-viable fetuses, it was "up to the legislature to create the cause of action." *Id.* at 1098.

it was necessarily viable. Appellant's argument, however, is based upon a misunderstanding of the concept of "viability," at least for the purposes of the survival statute. In the *Bonbrest* case, which formed the basis for our jurisprudence in this area, the court stated that "the term 'viable' means that the foetus has reached such a stage of development that it can live outside of the uterus." *Bonbrest, supra,* 65 F.Supp. at 140 n. 8; *see also Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2817, 120 L.Ed.2d 674 (1992) ("viability ... is the time at which there is a reasonable possibility of maintaining and nourishing a life outside the womb") (opinion of O'Connor, Kennedy, and Souter, JJ.); *Roe v. Wade,* 410 U.S. 113, 160, 93 S.Ct. 705, 730, 35 L.Ed.2d 147 (1973) (viability is the point at which the fetus is "potentially able to live outside the mother's womb, albeit with artificial aid"). *Bonbrest* demonstrates that the concept of viability relates to the *capability* of the fetus at its stage of development to survive apart from its mother. If viable, it "is capable *now* of being ushered into the visible world." *Bonbrest, supra,* 65 F.Supp. at 141 (emphasis in original). This concept of viability as encompassing the ability of the fetus at a particular stage of development to survive apart from the mother is reflected in the decisions of other courts. *See, e.g., Libbee v. Permanente Clinic,* 268 Or. 258, 518 P.2d 636, 637 n. 4 (1974) (en banc) (" 'viable' unborn child is one which has developed in its mother's womb to the point that it is capable of independent existence outside its mother's womb"); *Hudak, supra,* 567 A.2d at 1096 (non-viable means "incapable of living outside the womb because of immaturity"); Sheldon R. Shapiro, Annotation, *Right to Maintain Action or to Recover Damages for Death of Unborn Child,* 84 A.L.R.3d 411, 432 n. 72 (1978) (word "viable" as used in most judicial decisions refers to state of prenatal development at which fetus would be "capable of independent existence" if removed from mother's womb).

▉ In the case before us, it is undisputed that Ms. Ferguson's pregnancy had not progressed beyond twenty and one-half weeks. In its motion for summary judgment, the District presented authority for the proposition that no fetus at that stage of development can survive apart from its mother, even with artificial aid. The District referred to decisions of the United States Supreme Court such as *Roe v. Wade, supra,* 410 U.S. at 160, 93 S.Ct. at 730, in which the Court stated that "[v]iability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." The District also cited *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 515–16, 109 S.Ct. 3040, 3055–56, 106 L.Ed.2d 410 (1989), in which Chief Justice Rehnquist referred to the trial court's findings that " '23½ to 24 weeks gestation is the earliest point in pregnancy where a reasonable possibility of viability exists,' " and that " 'the medical evidence is uncontradicted that a 20-week fetus is *not* viable.' " *Id.* at 515, 109 S.Ct. at 3055.[10] Additionally, the District presented a handbook for health professionals written by the American College of Obstetrics and Gynecologists entitled "Public Health Policy Implications of Abortion," in which a section on "Fetal Viability" pointed out that:

> The earliest point at which a fetus can survive is 23–24 weeks....
>
> ....
>
> While even more of the ... approximately 24–28–week[ ] fetuses are expected to survive in the near future, there is an "anatomic threshold" for fetal survival of about 23–24 weeks of gestation.... This is because the fetal lung does not mature sufficiently to permit normal or even mechanically assisted respiration ... before week 23–24 of gestation.

---

10. Chief Justice Rehnquist delivered the opinion of the Court in *Webster* as to parts I, II–A, II–B, and II–C. As to parts II–D and III, which contained the above quoted language, the Chief Justice wrote an opinion in which Justices White and Kennedy joined. *See also Casey, supra,* 112 S.Ct. at 2811 (majority opinion) (recognizing onset of viability at twenty-three to twenty-four weeks).

The District also presented a portion of the deposition testimony of its own expert, Dr. John W. Larsen, Jr., who testified regarding the alleged respiratory effort of a fetus at such an early stage of pregnancy. Dr. Larsen explained that the fetus could "make little chest motions, but there are no lungs with open alveoli behind them to support them. It is like an early reflex chest motion...." [11]

In contradistinction to this extensive authority, appellant presented a one-sentence conclusory assertion by its expert that "[i]t is my professional opinion that to a reasonable degree of medical certainty that the Ferguson child was born viable." The expert included no specific bases for this conclusion,[12] nor were any other facts offered by appellant in support of her position. Moreover, and importantly, the expert gave no definition of the precise concept of viability to which his opinion was addressed.

Summary judgment may be granted if the moving party demonstrates through " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Nader v. Toledano,* 408 A.2d 31, 41 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). The moving party bears the burden of demonstrating the absence of any material issues. "The standard for granting summary judgment is the same as that for granting judgments n.o.v." *Taylor v. Eureka Inv. Corp.,* 482 A.2d 354, 357 (D.C.1984). Thus, all evidence must be viewed in the light most favorable to the non-moving party and if a reasonable juror could find for the non-moving party, then summary judgment is inappropriate. Once the movant satisfies this burden by making the required showing, the burden shifts to the non-moving party to show the existence of an issue of material fact. The moving party's factual allegations must be countered by the non-moving party with specificity, Super.Ct.Civ.R. 56(e); *Miller v. American Coalition of Citizens with Disabilities, Inc.,* 485 A.2d 186, 191 (D.C.1984), and conclusory allegations are insufficient to raise a genuine issue of fact, *Moseley v. Second New St. Paul Baptist Church,* 534 A.2d 346, 349 (D.C.1987); *Spellman v. American Sec. Bank,* 504 A.2d 1119, 1123–24 (D.C.1986).

In light of these principles, we think that summary judgment was proper here. In light of the District's particularized and extensive presentation, the expert's mere unsupported contrary assertion was insufficient to create the requisite genuine issue of fact as to viability within the legal definition of that term. *See Weight–Rite Golf Corp. v. United States Golf Ass'n,* 766 F.Supp. 1104, 1110 (M.D.Fla.1991) ("a party may not avoid summary judgment solely on the basis of an expert's opinion affidavit which does not provide specific facts from the record to support its conclusions"), *aff'd,* 953 F.2d 651 (11th Cir.1992); *see also Slaughter v. Southern Talc Co.,* 919 F.2d 304, 307 & n. 4 (5th Cir.1990) (expressly rejecting appellant's argument that an expert's affidavit in opposition to summary

---

**11.** We are not unmindful of the consideration recognized by the Supreme Court that viability cannot be determined solely by reference to one particular factor, "be it weeks of gestation or fetal weight or any other single factor," *Colautti v. Franklin,* 439 U.S. 379, 388–89, 99 S.Ct. 675, 681–83, 58 L.Ed.2d 596 (1979). In *Webster, supra,* 492 U.S. at 501, 109 S.Ct. at 3048, the Court upheld a Missouri statute requiring that, prior to performing an abortion on a woman believed to be twenty or more weeks pregnant, the physician must ascertain "whether the fetus is viable by performing 'such medical examinations and tests as are necessary to make a finding of the gestational age, weight, and lung maturity of the unborn child.' " In part II–D of the opinion, see note 10 and accompanying text, *supra,* Chief Justice Rehnquist noted that despite the trial court's findings as to the non-viability of a twenty-week old fetus, the trial court had also found that there may be a four-week error in estimating gestational age, "which supports testing at twenty weeks." 492 U.S. at 515–16, 109 S.Ct. at 3055–56.

**12.** He stated only that he had reviewed the medical records and that he questioned a rating of the physical condition of the fetus (apgar scores) in light of the fact that it had "a beating heart" and "obvious respirations."

judgment need not contain factual support for the opinion it expresses).

[A]ny affidavits offered in opposition to the [summary judgment] motion must set forth "specific facts" that would be admissible in evidence in order to show that a genuine issue exists for trial. This [r]ule applies equally to affidavits submitted by experts. While the expert may base his [or her] opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible in evidence, an expert's affidavit must nevertheless set forth specific facts in order to create an issue of fact for trial. Theoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert ... are not entitled to any weight when raised in opposition to a motion for summary judgment.

*Bell v. Swift Adhesives, Inc.*, 804 F.Supp. 1577, 1579 (S.D.Ga.1992) (internal citations, quotation marks, and brackets omitted). Thus, at a minimum, appellant had the obligation to make some showing of a basis for the conclusion that this fetus had the apparently unprecedented capacity to survive.[13] *See In re Air Crash Disaster at Detroit Metro. Airport*, 737 F.Supp. 427, 428 (E.D.Mich.1989), *aff'd without opinion*, 917 F.2d 24 (6th Cir.1990) (granting summary judgment against claim brought on behalf of fetus of twenty-two weeks; letter from medical doctor insufficient to create genuine issue of fact in face of authorities establishing viability at twenty-four weeks).

More importantly, appellant had the obligation to demonstrate that her expert was applying the legally correct definition of "viability" for purposes of this litigation under the survival statute rather than using the term as synonymous to merely being alive. If by asserting that the fetus was viable, appellant's expert meant no more than that the fetus emerged alive, then the issue of whether the fetus had the developmental capacity to survive outside

of its mother remained undisputed. All of appellant's arguments presented to the trial court on the issue of viability indicated that appellant was applying an incorrect definition of the term for purposes of the survival statute, and in this posture there was no reason to think that appellant's expert was not doing likewise.

### III.

We emphasize that we are deciding only the issue before us, a matter of interpretation of a particular statute dealing with a narrow issue of tort law. We hold that under existing law, the District of Columbia survival statute, D.C.Code § 12–101 (1989), does not grant to the legal representative of a non-viable fetus any cause of action brought in the name of the fetus, and that on the record in this case, summary judgment was properly granted under that principle.

*Affirmed.*

---

**13.** We note again that no malpractice was alleged with respect to the treatment of the fetus

after its emergence.