1999 OK 98

Sheila D. NEALIS and Michael Nealis, individually and as parents and next friends of Baby Nealis, a minor child, Plaintiffs–Appellants,

v.

Blake A. BAIRD, M.D., Jim Knecht, D.O., and Michael D. Hartwig, M.D., Defendants–Appellees.

No. 88653.

Supreme Court of Oklahoma.

Dec. 7, 1999.

Rehearing Denied Feb. 8, 2000.

Carolyn S. Smith, Ponca City, Oklahoma, for Appellants.

Dale Reneau and Jay L. Chapman, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Oklahoma, for Appellees Blake A. Baird, M.D. and Michael D. Hartwig, M.D.

Larry D. Ottaway, Monty B. Bottom, and Michael T. Maloan, Foliart, Huff, Ottaway & Caldwell, Oklahoma City, Oklahoma, for Appellee Jim Knecht, D.O.

OPALA, J.

¶ 1 This court granted certiorari to settle the first impression question whether a claim may be brought under Oklahoma's wrongful death statute[1] on behalf of a nonviable fetus

---

1.   12 Okla. Stat.1991 § 1053.

born alive. We are asked to decide whether the trial court committed reversible error by instructing the jury that damages are recoverable only if the deceased was a *viable* fetus or child at the time of his birth. We answer this question in the affirmative. Although we reach the same result as that of the Court of Civil Appeals, we vacate that court's opinion to provide a precedential ruling on a question of substantive law not previously determined by this court.

¶ 2 Also raised on certiorari are the following issues: (1) Did the erroneous instruction on viability carry over into deliberations on the Nealis's personal injury claim and mislead the jury? (2) Did the trial court err in refusing to instruct the jury on whether statutes governing abortions of potentially viable fetuses apply to the spontaneous, premature delivery of the Nealis child? (3) Does affirmance of the judgment on jury verdict for defendants Baird and Hartwig (on the personal injury claim) give rise—in the appellate stage of these proceedings—to preclusion of plaintiffs' wrongful death claim? We answer all three questions in the negative.

# I

## THE ANATOMY OF LITIGATION

¶ 3 In the summer of 1991, Sheila Nealis sought prenatal care from Dr. Blake Baird and Dr. Michael Hartwig, board certified family physicians who practiced together in Perry, Oklahoma. Mrs. Nealis was examined by Dr. Baird on 28 August 1991. This was the one and only time Dr. Baird saw her as a patient. Mrs. Nealis testified that her pregnancy up until the time of Dr. Baird's examination had been normal. She informed Dr. Baird that she smoked one to one-and-a-half packs of cigarettes per day, and Dr. Baird advised her to quit smoking. In regard to Dr. Baird's examination, she testified that she experienced unusual discomfort during the physical examination and had an uneasy feeling in her stomach upon leaving the clinic. Later that afternoon she felt cramping and had symptoms of morning sickness. She awakened in the middle of the night discharging fluid and blood.

¶ 4 In the morning, still cramping and bleeding, Mrs. Nealis returned to the clinic where she was examined by Dr. Hartwig. Her condition was diagnosed as threatening miscarriage. Dr. Hartwig ordered an ultrasound, which was performed the next day, 30 August 1991. The ultrasound established the gestational age of the fetus at 8.5 weeks. It showed no abnormalities.

¶ 5 Between 30 August and 30 September, Mrs. Nealis continued to bleed and have intermittent cramping, but did not return to the clinic.[2] On 30 September 1991, she presented herself to the Perry Memorial Hospital emergency room. Hospital records reflect that she told their personnel that the bleeding had begun within an hour prior to her appearance in the emergency room, and not that she had been cramping and bleeding off and on throughout the previous month. She was seen by Dr. Hartwig, who again diagnosed her condition as threatening miscarriage. He performed an examination during which Mrs. Nealis testified she felt pulling and tugging. Dr. Hartwig admitted her to the hospital and another ultrasound was performed. It showed a fetal gestational age of 13.4 weeks. It also noted a faint linear echo along the inferior margin of the placenta, which the radiologist reported as a possible placental abruption.

¶ 6 Mrs. Nealis was discharged from the hospital on 1 October 1991. The discharge papers she was given instructed her to resume normal activities, but Dr. Hartwig's dictated discharge summary report indicates he told her (verbally) to be at bed rest. Mrs. Nealis denies she was so instructed. She was given an appointment to see Dr. Hartwig at the clinic on 9 October 1991. She did not keep this appointment. Another appointment was scheduled for 25 October 1991, but she did not appear for that appointment either. At this point, Drs. Baird and Hartwig sent Mrs. Nealis a certified letter releasing

2. The record clearly establishes that Mrs. Nealis did not come into the clinic between 30 August 1991 and her presentation at the emergency room on 30 September 1991. Whether she had an appointment for a regular prenatal check-up between those two dates and failed to keep it was strongly suggested by the testimony, but not firmly proved.

her from their care due to her failure to keep both scheduled and emergency room follow-up appointments. Neither physician ever treated Mrs. Nealis again. At no time did Dr. Hartwig refer Mrs. Nealis to an obstetrician or otherwise advise her to seek the services of a specialist in obstetrics.

¶ 7 Between 1 October 1991 and 25 November 1991, Mrs. Nealis continued to cramp and bleed but did not return to the Baird–Hartwig clinic. She testified that she was dissatisfied with their care and did not want to see them again. In late October or early November, she made an appointment with another physician for 5 December 1991. Her pregnancy came to an end before she could keep that appointment.

¶ 8 On 25 November 1991, Mrs. Nealis again presented herself to the Perry Memorial Hospital emergency room with bleeding and intermittent contractions. She was treated for premature labor by Dr. Jim Knecht, the physician on call that night. Based upon the date Mrs. Nealis gave for the first day of her last menstrual period, the gestational age of the fetus at this time was between 24 and 25 weeks. This conflicted with the clinical examination performed by Dr. Knecht as well as the two earlier ultrasound findings, based upon which the fetus had a gestational age of 20 weeks. Dr. Knecht admitted Mrs. Nealis to the hospital and a third ultrasound examination was performed. It agreed with Dr. Knecht's clinical examination and with the previous ultrasounds and showed the gestational age of the fetus to be 20–21 weeks. It also showed a placental abruption.

¶ 9 Dr. Knecht prescribed tocolytic drugs for Mrs. Nealis to stop her contractions. She was given the maximum permissible dosage, but labor continued. Dr. Knecht then consulted Dr. Mary Wren, the resident physician in charge of labor and delivery at Oklahoma Memorial Hospital ("OMH") in Oklahoma City. Initially, Dr. Wren recommended transferring Mrs. Nealis to OMH, but after consulting Dr. Fishburne, the attending physician,[3] the recommendation to transfer was rescinded. Based on the information provided by Dr. Knecht, which included the ultrasound finding of gestational age but not the gestational age based on menstrual history, Drs. Wren and Fishburne *concluded that the Nealis's unborn child was not viable and that OMH could offer no treatment* not already being offered by Dr. Knecht in Perry. Furthermore, the transfer itself posed a risk of hemorrhage to Mrs. Nealis. Accordingly, the transfer plan was abandoned.

¶ 10 Dr. Wren also recommended to Dr. Knecht that he administer pain medication. Dr. Knecht prescribed Demerol despite its effect of suppressing respiration in newborns. He hoped that the Demerol might permit sufficient relaxation to arrest the premature labor. A fetal heart monitor was removed, but fetal heart tones continued to be monitored by the nurses every twenty minutes.[4] If labor did not cease and the child was delivered, it was to be treated as a 20–21 week old fetus in accordance with the ultrasound findings, and no attempt to resuscitate it was to be made.

¶ 11 Labor did not cease, and the Nealis baby emerged from the womb at 3:20 a.m. on 26 November 1991. Dr. Knecht was not present. The delivery occurred very suddenly, and only the nurses were in attendance.

¶ 12 Mrs. Nealis testified that the baby appeared small, but normal and that its skin color was pink. The umbilical cord was clamped. The baby's airways were not suctioned and Narcon, the antidote to Demerol, was not administered. One of the nurses in attendance at the time of delivery testified that the baby made some gasping respirations before it was rushed to the nursery. The baby's birth weight and length were later recorded as 347 grams and ten inches, respectively. Its Apgar scores, measurements of a baby's respiratory, circulatory,

---

3. Dr. Fishburne was head of the OMH Department of Obstetrics and Chair of the University of Oklahoma College of Medicine Department of Obstetrics.

4. The record does not reflect precisely when the last fetal heart tones were heard by Dopplar, i.e. whether the unborn child still exhibited cardiac activity sometime within twenty minutes of delivery.

and motor function, were all zero.[5] Its eyes were still fused. Dr. Knecht, who was also the county medical examiner, recorded the birth as a still birth. According to the doctor, he originally gave the family a choice of a funeral or laboratory disposal of the child's remains, but after speaking to the funeral home director, informed the family that burial was recommended. According to Mrs. Nealis's mother, Dr. Knecht initially offered to dispose of the baby's remains, but later told the family the baby's remains would have to go to a funeral home because the baby was bigger than anticipated.

¶ 13 Mr. and Mrs. Nealis brought suit against all three physicians. In their first claim, pressed against Drs. Baird and Hartwig only, plaintiffs alleged that the prenatal care rendered by the two physicians was negligent, causing each plaintiff personal injuries for which damages were sought. Plaintiffs advanced a second claim against Drs. Baird, Hartwig and Knecht for the wrongful death of their son, Matthew Nealis, alleging that negligent acts and omissions of all three physicians contributed to Matthew's early birth and resulting death. The case was tried to a jury in September 1996, and a verdict for defendants was returned on both claims. Mr. and Mrs. Nealis appealed.

¶ 14 The Court of Civil Appeals affirmed the judgment in favor of Drs. Baird and Hartwig on the personal injury claim, but reversed that for the defendants on the wrongful death claim, remanding that cause for a new trial. The defendants sought rehearing. Dr. Knecht's petition was granted. In its opinion on rehearing, the Court of Civil Appeals left undisturbed its holding that affirmed the judgment on the personal injury claim and reversed that for Drs. Baird and Hartwig on the wrongful death claim, but this time affirmed the judgment for Dr. Knecht on the wrongful death claim. Drs. Baird and Hartwig and Mr. and Mrs. Nealis sought certiorari.

## II

### STANDARD OF REVIEW

■ ¶ 15 With one exception, the issues raised on certiorari in this case rest upon whether the trial court correctly instructed the jury. In reviewing assigned error in jury instructions, this court must consider the instructions as a whole.[6] We inquire on review whether the instructions reflect the Oklahoma law on the relevant issue, not whether the instructions were perfect.[7] A judgment will not be disturbed on appeal unless it appears reasonably evident that the jury was misled by the allegedly erroneous instruction.[8] By statute, an appellate court may not disturb a judgment for misdirection of the jury in the absence of a miscarriage of justice or a substantial violation of the complaining party's constitutional or statutory rights.[9] We have oft stated that the test upon review of an instruction urged as improperly given or refused is whether there is a probability that

5. The testimony of both Mrs. Nealis and a nurse in attendance at the delivery failed to reveal whether any tests were performed on the child in the room where it was delivered. Where and when the child was first tested on the Apgar scale was not brought out in the testimony. Normally, those tests are performed within one minute of delivery.

6. *Dutsch v. Sea Ray Boats, Inc.*, 1992 OK 155, ¶ 7, 845 P.2d 187, 189; *Messler v. Simmons Gun Specialties, Inc.*, 1984 OK 35, ¶ 25, 687 P.2d 121, 129.

7. *Dutsch, supra,* note 6 at ¶ 7, at 189; *Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1297 (10th Cir.1989).

8. *Messler, supra,* note 6 at ¶ 25, at 129; *See also, Lee v. Volkswagen of America*, 1984 OK 48, ¶ 34, 688 P.2d 1283, 1289–90.

9. The provisions of 20 O.S.1991 § 3001.1 state:

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

The provisions of 12 O.S.1991 § 78 state:

"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

the jury was misled into reaching a result different from that which would have been reached but for the error.[10] With these principles in mind, we turn now to examine the jury instructions which plaintiffs contend require reversal of the judgment on jury verdict in the two claims pressed below.

## III

## OKLAHOMA'S WRONGFUL DEATH STATUTE ENCOMPASSES A CLAIM FOR THE LOSS OF A NONVIABLE FETUS BORN ALIVE

■ ¶ 16 The jury was in effect instructed at trial that no claim may be pressed under Oklahoma's wrongful death statute for the death of a nonviable fetus. Instruction No. 7 states:

### INSTRUCTION NUMBER 7

### WRONGFUL DEATH—ELEMENTS OF LIABILITY

"For Plaintiffs to recover damages for the death of Matthew Nealis, Plaintiffs have the burden of proving both of the following propositions:

*First, that Matthew Nealis was a viable fetus or child at the time of his birth.*

Secondly, that a negligent or intentional act or omission of one or more of the Defendants was a direct cause of the death of said Matthew Nealis.

As used in these instructions, a human fetus is "viable" if the fetus, at the time of premature birth, is capable of living outside the womb of the mother assuming the fetus receives necessary medical care.

*If you find that Matthew Nealis was not a viable fetus, you must return a verdict in favor of all of the defendants on Plaintiffs wrongful death claim.* If you find that Matthew Nealis was a viable fetus, you should proceed to determine the other issues set forth in this Instruction." (emphasis added)

¶ 17 The Court of Civil Appeals held that this instruction improperly interposed viability as a condition precedent to recovery for the wrongful death of a nonviable fetus without first determining whether the fetus was stillborn or born alive. The appellate court stated that live birth "has always accorded, and should continue to accord, a child the status of 'one' on whose behalf an action may be maintained under the wrongful death statute."[11] As to Drs. Baird and Hartwig, the appellate court held that the imposition of viability as a precondition to recovery in the face of a live birth was reversible error, requiring remand for a new trial. As for Dr. Knecht on the other hand, the Court of Civil Appeals held that the erroneous viability instruction was harmless because, if Matthew was not viable, no causal connection between an act or omission by Dr. Knecht and Matthew's death could be established. Accordingly, the appellate court affirmed the judgment in favor of Dr. Knecht. Drs. Baird and Hartwig seek review insofar as the intermediate court recognized a claim for the wrongful death of a nonviable fetus born alive. Defendants argue that this holding is contrary to established case law as well as confusing, unreasonable, and illogical. Plaintiffs seek corrective relief from the appellate court's view that Instruction No. 7, although error, was harmless as to Dr. Knecht. They argue that the viability instruction prevented the jury from considering the loss-of-chance doctrine.

¶ 18 While our case law recognizing personal injury claims by, and wrongful death claims on behalf of, the unborn has moved over the years in the direction of increased respect for fetal life, we have never before considered the precise question presented here—whether a child incapable of sustaining life outside the womb is nevertheless to be included within our wrongful death statute if the child, however briefly, emerges alive from the womb.

---

10. *Dutsch, supra,* note 6 at ¶ 7, at 189; *Woodall v. Chandler Material Co.,* 1986 OK 4, ¶ 13, 716 P.2d 652, 654; *Reinhart & Donovan Co. v. Williamson,* 191 Okl. 539, 131 P.2d 765, 766 (Okla. 1942).

11. *Nealis v. Baird,* No. 88,653 at 10–11 (Okla. App. June 2, 1998) (opinion on rehearing).

## A.

### Historical Development of the Wrongful Death Action Where Death Occurs as a Result of Prenatal Injuries

¶ 19 At common law, a tortfeasor who harmed another could be held liable in damages for the injury, but if the injury resulted in the person's death, the right of action for personal injuries abated.[12] Because the common law recognizes no action for wrongful death,[13] the dependents of one who was killed by the tortious act of another were often left destitute and without a legal remedy.[14] To alleviate the harshness of the common law, Parliament passed the Fatal Accidents Act of 1846 (more commonly known as Lord Campbell's Act), creating a new cause of action for wrongful death.[15] Its passage was soon followed by the enactment of similar statutes in every American jurisdiction.[16] These statutes generally provided that a decedent's personal representative could bring an action for the

decedent's death only if at the time of his or her death, the decedent had a right of recovery for the injuries in suit. The wrongful death action was hence viewed as derivative of a personal injury action.[17]

¶ 20 The wrongful death statutes first enacted in the nineteenth century provided relief in the vast majority of cases which had previously gone uncompensated. But children whose death was caused by prenatal injury were soon held excluded from the coverage of wrongful death statutes because they had no claim at common law for prenatal injuries if they survived. In *Dietrich v. Inhabitants of Northampton,*[18] decided in 1884, in an opinion delivered by Holmes, J., the highest court of Massachusetts held that a child born prematurely and dying as the result of injuries inflicted while it was *en ventre [de] sa mere* was not a person within the meaning of the statute creating an action for wrongful death.[19] The court relied principally on the lack of any known decision per-

12. At common law, the right of action for personal injury stands extinguished by the death of the injured party. This rule is expressed in the Latin maxim *actio personalis moritur cum persona*—a personal right of action dies with the person. BLACK's LAW DICTIONARY, p. 31 (6th ed.1990).

13. *Ouellette v. State Farm Mutual Automobile Ins. Co.,* 1994 OK 79, ¶ 8, 918 P.2d 1363, 1366. *See,* Baker v. Bolton, 1808, 1 Camp. 493, 170 Eng. Rep. 1033 (holding that a husband had no legal remedy for the death of his wife, the court stated that "in a civil court the death of a human being could not be complained of as an injury."). With some dissent and a few exceptions, this decision was followed both in England and in the United States. W. Page Keeton, ed. PROSSER AND KEETON ON THE LAW OF TORTS § 127, at 945 (5th ed.1984).

14. W. Page Keeton, ed. PROSSER AND KEETON ON THE LAW OF TORTS § 127, at 945 (5th ed.1984).

15. 9 & 10 Vict. C.93 (1846).

16. The first wrongful death statute was adopted by New York in 1847. Laws of 1847, Ch. 450. Today, every state has a statute authorizing a wrongful death action. 1 Stuart M. Speiser, et al., RECOVERY FOR WRONGFUL DEATH AND INJURY § 1:9 at 32–33 (3rd ed.1992). Most of these statutes are modeled on Lord Campbell's Act, providing compensation to specified beneficiaries for economic loss, such as support or services, sustained as a result of the decedent's death. A minority of states have enacted survival statutes, under which the decedent's estate is compensated ac-

cording to a formula based upon the loss of the decedent's life-time earnings less living expenses. W. Page Keeton, ed. PROSSER AND KEETON ON THE LAW OF TORTS § 127, at 946 (5th ed.1984). Oklahoma's original wrongful death statute, which was substantially similar to today's version, was passed prior to statehood. *See,* Statutes of Oklahoma (1890) § 4338. It follows the language of Lord Campbell's Act. *See, Ouellette v. State Farm Mutual Automobile Ins. Co.,* 1994 OK 79, ¶ 8, n. 13, 918 P.2d 1363, 1366, n. 13.

17. *Ouellette v. State Farm Mutual Automobile Ins. Co.,* 1994 OK 79, ¶ 8, n. 14, 918 P.2d 1363,- 1366, n. 14 ("A death action rests on tortious conduct for which the decedent, had he lived, could have maintained an action."); *Riley v. Brown and Root, Inc.,* 1992 OK 114, ¶ 10, 836 P.2d 1298, 1300–01 ("The action for wrongful death is not a separate and distinct tort, but is an action which derives from the rights of the decedent. (citation omitted) Whatever rights the decedent might have had in his life accrue to the personal representative at death, thus overcoming the common law barrier of death."); *Haws v. Luethje,* 1972 OK 146, ¶ 14, 503 P.2d 871, 874; *Hill v. Graham,* 1967 OK 10, ¶ 14, 424 P.2d 35, 37–38.

18. 138 Mass. 14, 52 Am. Rep. 242, 1884 WL 4976 (1884).

19. *Id.* at 4976, 3. The phrase *"en ventre sa mere"* is in Norman French. It means "in his mother's womb." J.H. Baker, Manual of Law French, p. 212 (2nd ed.1990).

mitting a child born alive and surviving to bring a personal injury action for injuries received while the child was in its mother's womb.[20] It also reasoned that an infant dying before it was able to live as a being separated from its mother cannot be said to have become a person recognized by law as having *locus standi* in court.[21] The court concluded that inasmuch as the unborn child is a part of the mother at the time of the injury, any damages incurred (which are not too remote to be recovered) are recoverable by the mother alone.[22]

¶ 21 Although an occasional dissent questioned its wisdom,[23] *Dietrich* was the controlling precedent on prenatal injury well into the twentieth century.[24] Then, in 1946, in *Bonbrest v. Kotz*,[25] a District of Columbia court, rejecting both the argument that an unborn child is a part of the mother[26] and the argument based on lack of precedent,[27] held that a negligence action could be brought to recover damages for prenatal injuries *if* the injury was inflicted when the fetus was viable *and* the child was thereafter born alive.[28] The court focused upon viability as the appropriate point in time to recognize an unborn child's separate existence for the purpose of tort recovery. This is so because viability marks the moment when the unborn child can survive independently of its mother.[29] Soon after *Bonbrest*, the viability requirement, *as it relates to the time of injury*, came to be abandoned in personal injury actions so that recovery could be had for a prenatal injury inflicted at any time during

**20.** *Id.* at 4976, 1 ("But no case, so far as we know, has ever decided that, if the infant survived, it could maintain an action for injuries received by it while in its mother's womb.").

**21.** *Id.* at 4976, 2.

**22.** *Id.* at 4976, 3. The primitive state of medical and forensic technology, together with a lack of information regarding fetal development, made it difficult in the nineteenth century to determine whether a prenatal injury or neonatal death was chargeable to natural causes or tortious injury. *See,* Clarke D. Forsythe, *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms,* 21 Valparaiso University Law Review 563, 575 (1987). Damage to the mother, on the other hand, was readily assessable as in any other case of tortious injury to the person.

**23.** *See, e.g.,* the vigorous dissent by Boggs, J. in *Allaire v. St. Luke's Hospital,* 184 Ill. 359, 56 N.E. 638 (1900).

**24.** *See, e.g.,* Restatement of Torts § 869 (1939) ("A person who negligently causes harm to an unborn child is not liable to such child for the harm.").

**25.** 65 F.Supp. 138 (D.D.C.1946). *Bonbrest* was the first case to recognize, in the absence of explicit statutory authority, a personal injury claim based on an injury received while the victim was still in the womb. A California appellate court several years earlier had recognized such a claim and opined that a wrongful death action would also lie based upon a state statute providing that a child conceived but not yet born is to be deemed an existing person to the extent necessary for the preservation of its "interests" in the event of its subsequent birth. *See, Scott v. McPheeters,* 33 Cal.App.2d 629, 92 P.2d 678 (1939). The first decision of an American court of last resort to hold that a personal injury action would lie for prenatal injury was *Williams v. Marion Rapid Transit, Inc.,* 152 Ohio St. 114, 87 N.E.2d 334 (1949).

**26.** *Id.* at 141 ("As to a viable child being 'part' of its mother—this argument seems to me to be a contradiction in terms. True, it is in the womb, but it is capable now of extra-uterine life—and while dependent for its continued development on sustenance derived from its peculiar relationship to its mother, it is not a 'part' of the mother in the sense of a constituent element—as that term is generally understood. Modern medicine is replete with cases of living children being taken from dead mothers. Indeed, apart from viability, a non-viable foetus is not a part of its mother." [footnotes omitted.]).

**27.** *Id.* at 142. ("The common law is not an arid and sterile thing, and it is anything but static and inert. Indeed, as Chief Justice Stone has so well said: 'If, with discerning eye, we see differences as well as resemblances in the facts and experiences of the present when compared with those recorded in the precedents, we take the decisive step toward the achievement of a progressive science of law. If our appraisals are mechanical and superficial, the law which they generate will likewise be mechanical and superficial, to become at last but a dry and sterile formalism.' " [quotation from Chief Justice Stone in *Common Law in the United States,* 50 Harv L.Rev. 4, 9–10 (1936)]).

**28.** *Id.* at 141.

**29.** The court emphasized that the child's viability distinguished the instant case from *Dietrich* where the child was born at sixteen to twenty weeks gestation, well before the point of viability, and survived no more than ten or fifteen minutes. *Id.* at 141.

gestation as long as the child was subsequently born alive.[30]

■ ¶ 22 After *Bonbrest,* the impediment to recovery for *fatal* prenatal injuries under the states' wrongful death statutes—that the decedent would have had a claim for the injuries had he lived—was removed. Cognizance of wrongful death claims logically followed. Initially, recovery depended upon the live birth of a viable infant who subsequently died from the injuries it received *en ventre [de] sa mere.*[31] It was not long before this requirement, i.e. live birth, began to be abandoned.[32] Although a few states still adhere to the live birth requirement,[33] *the majority of jurisdictions now permit wrongful death recovery on behalf of stillborns where the stillbirth occurs after the fetus has reached the point of viability.*[34] To summarize, a wrongful death action can generally be said to lie

**30.** See, e.g., Kelly v. Gregory, 282 App.Div. 542, 125 N.Y.S.2d 696 (1953); Hornbuckle v. Plantation Pipe Line Co., 212 Ga. 504, 93 S.E.2d 727 (1956); Bennett v. Hymers, 101 N.H. 483, 147 A.2d 108 (1958); Smith v. Brennan, 31 N.J. 353, 157 A.2d 497 (1960); Sinkler v. Kneale, 401 Pa. 267, 164 A.2d 93 (1960); Daley v. Meier, 33 Ill.App.2d 218, 178 N.E.2d 691 (1961); Womack v. Buchhorn, 384 Mich. 718, 187 N.W.2d 218 (1971); Day v. Nationwide Mutual Ins. Co., 328 So.2d 560 (Fla.App.1976). See also, William L. Prosser, HANDBOOK OF THE LAW OF TORTS, § 55 at 337 (4th ed.1971); Roland Chase, J.D., Annotation, Liability for Prenatal Injury, 40 A.L.R.3d 1222, § 3[a] (1971). The principal reason for abandoning the distinction was the perceived injustice of treating children similarly situated unequally: a surviving child suffered the same harm after birth from an injury whether it was inflicted in the ante- or post-viability stage. See, Smith v. Brennan, 31 N.J. 353, 157 A.2d 497 (1960) ("Whether viable or not at the time of the injury the child sustains the same harm after birth, and therefore should be given the same opportunity for redress.") Id. at 504. It is illogical to deny recovery to a living child based on the stage of its development when the injury occurred. William L. Prosser, HANDBOOK OF THE LAW OF TORTS, § 55 at 337 (4th ed.1971).

**31.** See, e.g., Steggall v. Morris, 363 Mo. 1224, 258 S.W.2d 577 (1953); Amann v. Faidy, 415 Ill. 422, 114 N.E.2d 412 (1953).

**32.** Verkennes v. Corniea, 229 Minn. 365, 38 N.W.2d 838 (1949). Decided three years after Bonbrest, Verkennes held that a wrongful death action could be maintained on behalf of a stillborn child where the injury causing its death was inflicted when the child was viable. The court called it "too plain for argument" that where independent existence is possible and life is destroyed through a wrongful act, a cause of action arises whether or not live birth ensues. Id. at 841.

**33.** See, e.g., Justus v. Atchison, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122 (1977); Smith v. Columbus Community Hosp., Inc., 222 Neb. 776, 387 N.W.2d 490 (1986); Tanner v. Hartog, 696 So.2d 705 (Fla.1997).

**34.** Simmons v. Howard Univ., 323 F.Supp. 529 (D.D.C.1971); Eich v. Gulf Shores, 293 Ala. 95, 300 So.2d 354 (1974); Summerfield v. Superior Court, 144 Ariz. 467, 698 P.2d 712 (1985); Hatala v. Markiewicz, 26 Conn.Supp. 358, 224 A.2d 406 (1966); Worgan v. Greggo & Ferrara, Inc., 50 Del. 258, 128 A.2d 557 (1956); Porter v. Lassiter, 91 Ga.App. 712, 87 S.E.2d 100 (1955); Volk v. Baldazo, 103 Idaho 570, 651 P.2d 11 (1982); Chrisafogeorgis v. Brandenberg, 55 Ill.2d 368, 304 N.E.2d 88 (1973); Britt v. Sears, 150 Ind.App. 487, 277 N.E.2d 20 (1971); Hale v. Manion, 189 Kan. 143, 368 P.2d 1 (1962); Mitchell v. Couch, 285 S.W.2d 901 (Ky.1955); Danos v. St. Pierre, 402 So.2d 633, 637 (La.1981); State ex rel. Odham v. Sherman, 234 Md. 179, 198 A.2d 71 (1964); Mone v. Greyhound Lines, Inc., 368 Mass. 354, 331 N.E.2d 916 (1975); O'Neill v. Morse, 385 Mich. 130, 188 N.W.2d 785 (1971); Verkennes v. Corniea, 229 Minn. 365, 38 N.W.2d 838, 10 A.L.R.2d 634 (1949); Rainey v. Horn, 221 Miss. 269, 72 So.2d 434 (1954); O'Grady v. Brown, 654 S.W.2d 904 (Mo.1983); White v. Yup, 85 Nev. 527, 458 P.2d 617 (1969); Poliquin v. MacDonald, 101 N.H. 104, 135 A.2d 249 (1957); Salazar v. St. Vincent Hosp., 95 N.M. 150, 619 P.2d 826 (1980); Hopkins v. McBane, 359 N.W.2d 862 (N.D.1984); Werling v. Sandy, 17 Ohio St.3d 45, 476 N.E.2d 1053 (1985); Evans v. Olson, 550 P.2d 924 (Okla.1976); Libbee v. Permanente Clinic, 268 Or. 258, 518 P.2d 636, 520 P.2d 361 (1974); Presley v. Newport Hosp., 117 R.I. 177, 365 A.2d 748, 84 A.L.R.3d 391 (1976); Fowler v. Woodward, 244 S.C. 608, 138 S.E.2d 42 (1964); Nelson v. Peterson, 542 P.2d 1075 (Utah 1975); Vaillancourt v. Medical Ctr. Hosp. of Vt., Inc., 139 Vt. 138, 425 A.2d 92 (1980); Moen v. Hanson, 85 Wash.2d 597, 537 P.2d 266 (1975); Baldwin v. Butcher, 155 W.Va. 431, 184 S.E.2d 428 (1971); Kwaterski v. State Farm Mut. Auto. Ins. Co., 34 Wis.2d 14, 148 N.W.2d 107 (1967). Strzelczyk v. Jett, 264 Mont. 153, 870 P.2d 730 (1994). Additionally, Georgia allows wrongful death recovery on behalf of stillborns who are injured after the point of "quickness", i.e. discernable movement by the fetus. Porter v. Lassiter, 91 Ga.App. 712, 87 S.E.2d 100 (1955). For a comprehensive list of those jurisdictions where an action may be maintained for the wrongful death of a stillborn fetus and those where such an action may not be maintained, see, Sheldon Shapiro, J.D., Annotation, Right to Maintain Action or to Recover Damages for Death of Unborn Child, 84 A.L.R.3d 411.

where the child's death is caused by prenatal injury inflicted any time during gestation if either (1) the child is subsequently born alive after reaching the point of viability or (2) the child is stillborn but survived the injury *in utero* to reach the point of viability.

¶ 23 Viability, then, has developed as the dividing line between those claims for wrongful death due to prenatal injury which are generally recognized as actionable and those that are not, at least where a child is stillborn. Where a live birth has occurred prior to the child having attained viability, the few extant decisions are in conflict as to whether a wrongful death action may be maintained. The principal reasons advanced against permitting the action harken back to *Dietrich* and its successors. These reasons include lack of precedent for such an action, the difficulty of proof, fear of fictitious claims, the necessity of legislative action authorizing such a suit, and the traditional notion that prior to viability, the fetus is a part of the mother's body and not a distinct individual.

¶ 24 In *Hudak v. Georgy*,[35] parents brought a wrongful death action on behalf of triplets born alive before they had reached the stage of viability. The trial court dismissed the claim on the ground that a wrongful death cause of action does not lie on behalf of a nonviable fetus.[36] The Pennsylvania Supreme Court reversed, holding that viability is not a prerequisite for wrongful death liability where a child is born alive.[37] *The court termed it an "unremarkable prop-*

*osition" that "an infant, born alive is, without qualification, a person."*[38]

¶ 25 In *Group Health Association, Inc. v. Blumenthal*,[39] Maryland's highest court held that a cause of action lies for the wrongful death of a 19 to 20–week old fetus born alive, who died approximately 2 ½ hours after birth.[40] It is unclear whether in *Blumenthal* the court actually considered the effect of the child's nonviability *at the time of its birth and death* inasmuch as the defendant argued only that the action failed despite live birth because the child *sustained the injuries prior to viability.* Several of the cases cited in *Blumenthal* concern the latter issue rather than the former.[41] While the authority cited in support of its holding is questionable, *Blumenthal* clearly held that *a child who was not viable at the time of its birth and death could be the subject of a wrongful death claim where death was due to tortious, prenatal injuries.*[42] The court rejected the arguments against recovery based upon difficulty of proof and the possibility of fictitious claims as of no greater significance than in other tort cases.[43] It also noted that lack of precedent was no longer an obstacle to actionability.[44] Finally, it dismissed the argument that recovery would conflict with the United States Supreme Court decision in *Roe v. Wade*[45] by noting that Mrs. Blumenthal's *right to abort the child at the time the child was born alive is utterly unrelated to the alleged negligence* which caused the child's premature birth.[46]

¶ 26 *Torigian v. Watertown News Co., Inc.*,[47] involved a child injured at approxi-

---

35. 535 Pa. 152, 634 A.2d 600 (1993).

36. *Id.* at 601.

37. *Id.* at 602.

38. *Id.* at 603.

39. 295 Md. 104, 453 A.2d 1198 (Ct.App.1983).

40. *Id.* at 1206.

41. *See, e.g., Hornbuckle v. Plantation Pipe Line Co.*, 212 Ga. 504, 93 S.E.2d 727 (1956) (personal injury action by surviving child for tortious injury sustained at approximately six weeks gestation); *Bennett v. Hymers*, 101 N.H. 483, 147 A.2d 108 (1958) (personal injury action by surviving child for injury inflicted prior to viability); *Smith*

v. *Brennan*, 31 N.J. 353, 157 A.2d 497 (1960) (same); *Wolfe v. Isbell*, 291 Ala. 327, 280 So.2d 758 (1973) (wrongful death action on behalf of *viable* child born alive where injury sustained while child was a nonviable fetus).

42. *Group Health Association, Inc. v. Blumenthal, supra* note 39 at 1206.

43. *Id.* at 1206.

44. But see discussion of reliability of cited precedent, supra, note 41.

45. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

46. *Blumenthal*, supra, note 39 at 1207.

mately fourteen weeks' gestation, who continued to survive *in utero* until approximately twenty-three weeks gestation, and was then born alive and died within two-and-one-half hours due to the injuries it had suffered earlier in its gestation. The court held that a nonviable child born alive was a person within the meaning of the state's wrongful death statute and a claim for its wrongful death could be maintained. Examined and rejected were the various arguments against actionability, the court noting that precedent was not lacking and that problems of proof and the opportunity for fraudulent claims in such a case are no greater than in any other tort case.[48]

¶ 27 A few cases have gone even further, holding that a wrongful death action may be brought on behalf of a stillborn, nonviable fetus.[49] We believe we may count them among the jurisdictions which would recognize a wrongful death claim for a nonviable fetus born alive.

¶ 28 Adhering to the viability distinction, several decisions have held that there is no cause of action for the wrongful death of a nonviable child even if it is born alive. In *Miller v. Kirk,*[50] a wrongful death action was brought on behalf of an eighteen to twenty-two week old fetus. At the time of delivery the child exhibited a heartbeat, but died within minutes of birth. No other signs of life were recorded or recollected by the physician who performed the delivery and no attempts were made to resuscitate the infant due to its immaturity. The court considered its ultimate inquiry to be whether a nonviable fetus is a "person" within the meaning of the statute. The plaintiffs argued that where a child is born alive, it is a person and the concept of viability should be deemed irrelevant. The court disagreed, holding that a nonviable fetus, being incapable of existence independent of its mother, should not be regarded as a separate human being capable of maintaining a legal action in its own right.[51]

---

47. 352 Mass. 446, 225 N.E.2d 926 (1967).

48. *Id.* at 927.

49. In *Farley v. Sartin*, 195 W.Va. 671, 466 S.E.2d 522 (1995), the Supreme Court of West Virginia held that a wrongful death action can be brought based upon the stillbirth of a nonviable fetus killed *in utero* in an automobile accident at approximately eighteen to twenty-two weeks gestation. After reviewing at length the reasons generally put forth for permitting a cause of action for the tortious death of a viable unborn child, *the court could discern no persuasive reason to permit a cause of action for the death of a viable unborn child while denying such an action for a nonviable unborn child.* Two other states have held that a wrongful death cause of action may be brought on behalf of a stillborn, nonviable fetus. Unlike West Virginia, these courts have based their decisions upon specific statutory language. See, *Wiersma v. Maple Leaf Farms*, 1996 SD 16, 543 N.W.2d 787 (in using the term "unborn child" to enlarge the class of persons for whose loss a wrongful death action could be maintained, the intent of the Legislature was to include nonviable as well as viable unborn children—applying wrongful death statute to death of nonviable child stillborn at approximately 9–10 weeks gestation); *Connor v. Monkem Co., Inc.*, 898 S.W.2d 89 (Mo.1995) (in enacting statute providing that life begins at conception, that unborn children have protectable interests in life, health and well-being, and that the natural parents of unborn children have protectable interests in the life, health and well-being of their unborn children, the Legislature intended for the courts to interpret the word "person" as used in the wrongful death statute to allow a parent to maintain an action for the wrongful death of his unborn child, whether viable or not—applying wrongful death statute to the death of a nonviable child killed in utero in an automobile accident at approximately sixteen weeks gestation). Additionally, an Illinois statute provides that the state of gestation or development of a human being at the time of its death shall not be a consideration in the maintenance of any cause of action arising from a tortious injury causing death. Ill.Rev.Stat.1989, ch.70, par. 2.2 as amended in 1980. This statute has not yet been applied by a court decision to the wrongful death of a nonviable fetus, but was discussed in *Smith v. Mercy Hosp. & Medical Ctr.*, 203 Ill.App.3d 465, 148 Ill.Dec. 567, 560 N.E.2d 1164 (1990). The majority of jurisdictions which have considered recognition of a cause of action for a nonviable stillborn child have held that no such cause of action exists. *See, e.g., Santana v. Zilog*, 95 F.3d 780 (9th Cir.1996) (applying Idaho's wrongful death statute); *Humes v. Clinton*, 246 Kan. 590, 792 P.2d 1032 (1990); *Kandel v. White*, 339 Md. 432, 663 A.2d 1264.

50. 120 N.M. 654, 905 P.2d 194 (1995).

51. *Id.* at 197. It is not clear whether New Mexico was in this case denying recovery for pre-viability injuries only where the fetus is born prior to viability or whether it would deny recovery for pre-viability injuries even if the fetus is

¶ 29 In *Ferguson v. District of Columbia*,[52] a mother brought a wrongful death action on behalf of a nonviable fetus born at approximately twenty-and-one-half weeks gestation. The decedent exhibited a heartbeat and some degree of respiratory effort, but died within a short time after birth. The mother argued that the fact of her child's live birth distinguished her case from the earlier cases in which the court fixed viability as the point at which an independent action may be brought by or on behalf of an unborn child.[53] The court rejected live birth as the relevant precondition for a wrongful death cause of action. Instead, the court focused on the statutory requirement that the decedent might have pressed a personal injury claim had he not died. The court reasoned that just as the happenstance of live birth does not determine whether a wrongful death action lies for a viable fetus, neither should live birth determine the rights of a nonviable fetus. Focusing on the concept underlying the survival statute that the representative is merely bringing an action that the decedent could have brought had he or she not died, the court concluded with this analysis:

"Where the fetus emerges from the mother without the developmental capacity to survive, it would contradict the theory of a survival action to provide a cause of action to the representative of the fetus. Absent clear indication of contrary legislative intent, it would be anomalous to view an action as one that could have been brought by the fetus had the fetus not died when the fetus had never developed the capacity to survive in the first place."[54]

¶ 30 In *Brown v. Green*,[55] plaintiffs brought a wrongful death action on behalf of nonviable twins who were born alive but died shortly after birth, alleging negligent prenatal care had caused their premature birth and subsequent death. The court held that for purposes of a tort action, a mother and a nonviable fetus are considered a single entity and no cause of action can be brought on behalf of a nonviable fetus even if born alive.[56]

## B.

### Oklahoma's Recognition of Wrongful Death Action Due to Prenatal Injury

¶ 31 Oklahoma's wrongful death statute provides in pertinent part:

"A. When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, or his personal representative if he is also deceased, if the former might have maintained an action, had he lived, against the latter, or his representative, for an injury for the same act or omission...."[57]

¶ 32 Construing the substantially similar predecessor to § 1053, this court in 1976 held in *Evans v. Olson*[58] that a surviving child

---

subsequently born and survives. While the language used in the case is broad enough to include the latter, the question may remain open inasmuch as *Miller* clearly concerned a fetus nonviable when born.

**52.** 629 A.2d 15 (D.C.App.1993).

**53.** *Id.* at 17. *See, Greater Southeast Community Hosp. v. Williams*, 482 A.2d 394 (D.C.App.1984) (recognizing a wrongful death cause of action on behalf of a viable, stillborn fetus); *Jones v. Howard University*, 589 A.2d 419 (D.C.App.1991) (in the absence of a subsequent live birth, a tortious injury to a nonviable fetus is an injury to the mother).

**54.** *Id.* at 17. The court explicitly left open the question whether a person born subsequent to surviving an injury incurred as a nonviable fetus can later bring an action for damages for such injury. *Id.* at 17, n. 8.

**55.** 781 F.Supp. 36 (D.D.C.1991).

**56.** *Id.* at 38.

**57.** 12 O.S.1991 § 1053.

**58.** 1976 OK 64, 550 P.2d 924, *overruling Howell v. Rushing*, 1953 OK 232, 261 P.2d 217 and *Padillow v. Elrod*, 1967 OK 18, 424 P.2d 16 (both holding that no right of action for wrongful death can be maintained for a stillborn child because no cause of action accrues to that child for prenatal injuries). Referring to the opening words of § 1053, the court concluded that the pronoun "one" as used in the phrase "the death of one", included within it a viable, unborn child. The court noted that the pronoun "one" is practically indistinguishable from the noun "person", and that many of the cases in other jurisdictions which recognized a wrongful death action on

could bring a common-law personal injury action for prenatal injury and, if the prenatal injury resulted in the death of a *viable* child *en ventre [de] sa mere*, the child's representatives could bring an action under the wrongful death statute. Then, in *Guyer v. Hugo Publishing Co.*,[59] the Court of Civil Appeals, relying on the fact that *Evans* had only recognized a wrongful death cause of action for a *viable, unborn child,* held that Oklahoma did not recognize a wrongful death action for the loss of a *nonviable, stillborn* fetus.[60] A year later, this court handed down its decision in *Graham v. Keuchel,*[61] which held that a wrongful death action could be maintained for the death of a child who was born alive (after attaining viability) and died as the result of a preconception tort.[62]

¶ 33 Defendants argue that the instant case is governed by *Evans* and *Guyer,* which together, they urge, stand for the proposition that there is no cause of action for the wrongful death of a nonviable fetus under any circumstances. Plaintiffs respond that since *Evans* and *Guyer* both involve a fetus whose death occurred *prior to birth,* they do not control the instant case, where plaintiffs contend Matthew was born alive. We agree with plaintiffs. Both *Evans* and *Guyer* con-

cerned fetuses which were unarguably dead prior to birth and hence do not answer the precise question posed here.

¶ 34 Plaintiffs then contend that our decision in *Graham* is dispositive of the issue raised in this case. They argue that *Graham* removed viability as a consideration in a wrongful death action if the decedent is born alive at any time during gestation. Their reading of *Graham* is overbroad. The child in *Graham* was born alive after a full-term pregnancy, so that the question of the child's viability *at the time of its birth and death* was not in issue. What we rejected in *Graham* was the necessity of showing viability *at the time of the tortious act causing the injury.*[63] *Graham* moved a step beyond *Evans* in holding that a wrongful death action in Oklahoma can be predicated upon a prenatal injury that occurs prior to viability.[64] *The question we face today,* which was not before the court in *Graham,* is *whether a wrongful death action can be predicated upon a prenatal injury occurring prior to viability if the fetus is thereafter born alive before attaining viability.*

¶ 35 With this background in mind, we look now to the language and intent of Okla-

behalf of a viable, stillborn child had construed the word "person" in their respective statutes to include a viable, stillborn child.

**59.** *1991 OK CIV APP 121, 830 P.2d 1393.*

**60.** *Id.* at ¶ 8, at 1394. Plaintiffs sought damages for the wrongful death of their deceased minor son, a three-and-one-half month old fetus at the time of the accident which resulted in his death. Approximately one month after the accident, Mrs. Guyer suffered a miscarriage. In affirming summary judgment on the wrongful death action in favor of the defendants, the Court of Civil Appeals held that the *Evans* holding was limited to *viable, stillborn fetuses* and that, in the absence of a Supreme Court ruling to the contrary, the law as it existed prior to *Evans* applied to *nonviable fetuses.*

**61.** 1993 OK 6, 847 P.2d 342.

**62.** Parents sought damages for the wrongful death of their son, who died four days after birth from a fatal blood disease allegedly caused by the defendants' negligent medical treatment of the mother during an earlier pregnancy. The mother contended that the doctors failed to ascertain that she had RH-negative blood and hence failed

to administer an anti-sensitization drug to her when she miscarried an earlier pregnancy. Once sensitized, an RH-negative woman's blood creates antibodies which, in a subsequent pregnancy, may cross the placenta and attack and destroy the red blood cells of an RH-positive fetus. The damage to the fetus ranges from mild anemia to a severe blood disease called erythroblastosis fetalis (EBF), which can be, and in the *Graham* case was, fatal to the child. The tortious conduct complained of in *Graham* thus occurred prior to the child's conception. The doctors, relying on *Evans,* argued that a fetus must be viable at the time the tortious act is committed in order for a common-law negligence action to lie and hence for its derivative wrongful death action to arise. We rejected this reading of *Evans* as overbroad, noting that *Evans* involved a stillborn child while the *Graham* case involved a child who was born alive. There was no question in *Graham* about the child's viability at birth.

**63.** In fact, in *Graham* the tortious act occurred not just prior to viability, but prior to the child's conception.

**64.** In *Evans,* the tortious act had occurred after the child was already viable.

homa's wrongful death statute to determine whether a wrongful death action will lie for the death of a nonviable fetus born alive. The statute requires first that there be "the death of one." We have held that the word "one" as used in the statute is synonymous with the word "person".[65] *We have also settled that a fetus is a person for purposes of § 1053 even if it has never drawn an independent breath.*[66]

¶ 36 Webster's Encyclopedic Unabridged Dictionary of the English Language defines "person" as a "human being as distinguished from an animal or thing" and defines a human being as any member of the species *homo sapiens*. A nonviable fetus is a human being prior to reaching approximately twenty-four weeks of gestation. If it is not a human being prior to viability, it cannot become a human being thereafter. The traditional common-law notion that a nonviable fetus and its mother are a single entity rests upon outmoded scientific information and is no longer persuasive.

¶ 37 It might be argued that the words "one" or "person" imply more than mere biological existence, that there is a distinction between one's biological existence as a human being and a "person" to whom legal

rights must be extended. Whether such a distinction is tenable and, if so, the identification of qualities which are essential to personhood are matters of deep social and political division. Whatever argument can be made that a nonviable fetus is not a "person" when *en ventre*, we reject the notion that the distinction between biological existence and personhood can extend beyond live birth. *We hence hold here only that once live birth occurs, the debate over whether the fetus is or is not a person ends and the live born child attains the legal status of "one."* [67]

¶ 38 The wrongful death statute also requires that the decedent be one who could have maintained a personal injury action "had he lived." Defendants argue that the statute presupposes that the decedent at one time lived prior to dying. Since, they argue, a nonviable fetus has never lived, the phrase "had he lived" cannot logically be applied to a nonviable fetus.[68] We disagree. Although a nonviable fetus has never lived outside the womb and is incapable of surviving outside the womb, it does not follow that it has never lived. Contemporary scientific precepts accept as a given that human life begins at conception.[69] Unless terminated naturally or

65. *Evans v. Olson*, 1976 OK 64, ¶ 10, 550 P.2d 924, 928.

66. *Id.*

67. We find support for this position in the RESTATEMENT OF TORTS (SECOND) § 869, which provides:
(1) One who tortiously causes harm to an unborn child is subject to liability to the child for the harm if the child is born alive.
(2) If the child is not born alive, there is no liability unless the applicable wrongful death statute so provides.
The Restatement makes no distinction between viability and nonviability if the child is born alive. Its Comment on Subsection 2 indicates that live birth provides the basis for determining whether a person is in existence.

68. In their brief on certiorari, defendants state: "... there is no beginning of life" in the case of a nonviable fetus and, therefore, "the death of an unviable (sic) fetus does not exist."

69. "Human development begins at conception or fertilization, the process during which a male gamete or sperm (spermatozoon) unites with a female gamete or oocyte (ovum) to form a single cell called a zygote (Gr. zygotos, yoked together).

This highly specialized, totipotent cell marked the beginning of each of us as a unique individual." KEITH L. MOORE and T.V.N. PERSAUD, THE DEVELOPING HUMAN 14 (5th ed.1993); "The infant develops progressively from the single cell fertilized egg to a highly complex multicellular organism. The genetic constitution of the individual is established at the time of fertilization." SUSAN TUCKER BLACKBURN AND DONNA LEE LOPER, MATERNAL, FETAL AND NEONATAL PHYSIOLOGY 49 (W.B. Saunders Company 1992); "The rudiments of all major external and internal structures develop during the embryonic period, from 4 to 7 fetal weeks postconception (6–9 menstrual weeks) ... By the end of the seventh fetal week, all the major organ systems have been established." MICHAEL P. HARRISON, ET AL., THE UNBORN PATENT 14 (Grune & Stratton, Inc.1984); The fetal heart beats effectively by the 44th day of gestation and respiratory-like movements of the chest wall have recently been detected by 11 weeks. The intestine of the fetus is capable of peristalsis by the end of the first trimester of development. As early as 6 weeks after conception, electrical activity in the subcortical areas of the brain can be observed. By the 16th week, respiration and swallowing are present. The eyes with eyelids fused are present by the 8th week and eye movement begins by the 18th to 20th week. Taste

by human agency, that life will continue to develop not just until birth but throughout life.[70] In this case, Matthew was not only alive *en ventre [de] sa mere*, but may have emerged alive from the womb, however briefly. *That he was incapable of sustaining life once born does not negate the fact that he may at one time have lived and subsequently died.*[71]

¶ 39 Under our decision in *Graham*, a surviving child who suffers damages due to a prenatal injury inflicted before the child attains viability may bring a personal injury action against the tortfeasor. The phrase "had he lived" in our wrongful death statute merely expresses in the subjunctive mood the contrary-to-fact situation that if the decedent had lived, which he did not, he could have brought a personal injury action for the death-causing injuries. Had Matthew merely been injured by the alleged tortious acts which were said to have caused his death, he could have brought a personal injury action to recover damages for such injuries. That is all that the Lord Campbell's phrase "had he lived" requires.

¶ 40 We find nothing in the language or intent of Oklahoma's wrongful death statute that would prohibit its application to a nonviable fetus born alive. Nor does our review of the various arguments for and against

recognizing a wrongful death cause of action for a nonviable fetus born alive provide a single persuasive reason to deny a claim under these facts. While we are not without precedential jurisprudence for this decision, we recognize that precedent is sketchy. Yet we agree with the court in *Bonbrest* that we are obliged to "face the facts of life rather than [engage in] a myopic and specious resort to precedent to avoid attachment of responsibility where it ought to attach ..."[72] Nor do we discern here any greater problem regarding matters of proof or the possibility of fictitious claims than exist in any other tort case. Our discussion in *Evans* also disposes of any argument that legislative action is necessary to embrace within § 1053 the death of a nonviable fetus born alive. We said in that case that the Legislature, by tying § 1053 to the common-law action for damages for personal injury, had in essence left the reach of § 1053 to the growth of the common law.[73] Today's decision is in accord with our view expressed in *Evans*. Finally, we address ourselves to the potential objection to today's decision based on *Roe v. Wade*.[74] We discern no conflict between this pronouncement and the federal constitutional right of a woman to terminate her pregnancy by abortion. First, we note that we are concerned here with a child who was allegedly born alive. Nothing in *Roe prohibits* the

buds and the olfactory epithelium exist by the third month of development. Nerve endings and other structures capable of detecting pain, temperature and pressure are in existence by the 4th month of gestation. DALE RUSSELL DUNNIHOO, M.D., PH.D., FUNDAMENTALS OF GYNECOLOGY AND OBSTETRICS 286–299 (J.B. Lippincott Company, 1990); "Since World War II, and especially in the last decade, knowledge of the fetus and his environment has increased remarkably. As an important consequence the fetus has acquired status as a patient to be cared for by the physician...." LOUIS HELLMAN, ET AL., WILLIAMS OBSTETRICS 199 (14th ed.1971).

**70.** Many human organ systems are not completely developed even at birth. The respiratory system is not completed until approximately eight years of age, the reproductive system develops at puberty, and the human brain does not attain its full development until the age of sixteen.

**71.** Defendants in their brief claim that Matthew did not ever live and therefore cannot be said to have died. Expert testimony in the trial undermines this argument. For example, the radiolo-

gist who read the ultrasound taken at Perry Memorial Hospital on November 25, 1991, testified that ultrasound is performed to determine whether an intrauterine death has occurred or whether the fetus remains alive in the womb.

**72.** *Bonbrest v. Kotz*, 65 F.Supp. 138, 142 (D.D.C. 1946).

**73.** In *Evans*, we said, "It is not s1053 or its intent that is changed by this decision. The change comes in the common-law as applied in this jurisdiction so as to more fully adapt to present day life. The intent of s 1053 was to allow a death action if the deceased might have maintained an action had he lived. Having here recognized a common-law negligence action to a surviving child suffering a prenatal injury, it must follow that a wrongful death action may be maintained for a viable fetus which is stillborn. No violence has been done to the legislative intent under s 1053." *Evans v. Olson*, 1976 OK 64, ¶ 13, 550 P.2d 924, 928.

**74.** 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147.

states from affording legal protection to fetuses that are born alive. Moreover, any incongruity between the constitutional right to abort a nonviable fetus and this holding—that one can be held liable for its wrongful death—is misperceived. *Roe*'s conclusion that a fetus is not a person for purposes of the Fourteenth Amendment to the United States Constitution does not require that it be so considered for every other purpose. Federal jurisprudence proscribes the state's protection of the interests of the fetus only when those interests conflict with the privacy-anchored constitutional right of the pregnant woman to an abortion. Where both the state and the mother have identical interests in preserving the child's life and in vindicating harm resulting in its death, *Roe* poses no legal obstacle.[75]

¶ 41 We hold that where a nonviable fetus is born alive, its personal representatives may bring a wrongful death action based on the prenatal injuries resulting in its death. *Reason dictates that a child, once born alive, must be recognized as a person regardless of its ability to sustain life for any particular period of time thereafter.* While much that we have said could apply equally to *nonviable, stillborn* fetuses, *we explicitly limit today's decision to nonviable fetuses born alive.* Factors not considered in today's opinion may bear on whether liability should be extended to the wrongful death of a nonviable, stillborn fetus. We defer a ruling on the latter question to another day.

### C.

### The Erroneous Viability Instruction Requires Reversal of the Judgment for Drs. Baird and Hartwig

¶ 42 Jury Instruction No. 7 required the plaintiffs to prove two facts: (1) that Matthew Nealis was a viable fetus or child at the time of his birth and (2) that a negligent act or omission on the part of one or more of the defendants was a direct cause of Mat-

thew's death. Applying the principles that govern review of an erroneous jury instruction[76] we reverse the judgment on jury verdict in the wrongful death claim insofar as it affects Drs. Baird and Hartwig and remand this cause for a new trial. It appears to us reasonably evident that the jury was misled. We find support for this view in the handwritten note submitted by the jury to the judge during deliberation on the wrongful death claim. It asked whether deliberations would be over if they find that Matthew was not viable. It seems likely, indeed probable, that the jury addressed the viability issue first and, once deciding it, never proceeded to address the second issue contained in Instruction No. 7, whether a negligent act or omission of Dr. Baird and/or Dr. Hartwig was a direct cause of Matthew's death. With today's pronouncement—that a wrongful death action will lie for the death of a nonviable fetus born alive—plaintiffs are indeed entitled to have that issue submitted to another jury.

### D.

### The Trial Court's Error in Instructing the Jury Regarding Viability Was Harmless as to Dr. Knecht

¶ 43 Dr. Knecht's involvement in Matthew's care requires separate treatment. Three evidentiary elements are essential to a prima facie case of negligence: (1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure properly to exercise or perform that duty, and (3) an injury to plaintiff proximately caused by the defendant's breach of that duty.[77]

¶ 44 The Court of Civil Appeals, employing a traditional causation analysis, concluded that if Matthew was not viable, then "nothing Dr. Knecht did or did not do ... would have made any difference" and his conduct "could not have been the direct cause of baby Matthew's death." The appellate court hence held that the viability component of Instruc-

---

**75.** *See, e.g.,Gentry v. Gilmore,* 613 So.2d 1241, 1247 (Ala.1993) (Maddox, J., dissenting).

**76.** See text at Part II of this opinion.

**77.** *Akin v. Missouri Pacific RR Co.,* 1998 OK 102, ¶ 36, 977 P.2d 1040, 1054; *Jackson v. Jones,* 1995 OK 131, ¶ 5, 907 P.2d 1067, 1071–1072; *Lay v. Dworman,* 1986 OK 85, ¶ 5, 732 P.2d 455, 457; *Thompson v. Presbyterian Hosp., Inc.,* 1982 OK 87, ¶ 7, 652 P.2d 260, 263.

tion No. 7 was harmless error as to Dr. Knecht. This is so because, even assuming Matthew was born alive, Dr. Knecht's acts or omissions could not have been the cause of Matthew's death if the jury believed he was not viable.

■ ¶ 45 Plaintiffs argue that the appellate court failed to consider the effect of the erroneous viability instruction on the jury's consideration of the loss-of-chance doctrine.[78] The loss-of-chance doctrine, an alternative formulation of causation applied in medical malpractice cases where traditional causation is impossible of proof, was adopted by this court in *McKellips v. Saint Francis Hospital, Inc.*[79] *McKellips* permits recovery of damages resulting from a health care provider's failure to alter the course of a pre-existing condition by providing adequate care or treatment. To recover under this doctrine the deceased must have had a significant chance of survival prior to the alleged negligence, and the alleged negligence must have substantially decreased that chance of survival.[80] The jury is required to determine whether the increase in risk under the circumstances was more probably than not a substantial factor in causing the harm.[81]

¶ 46 Plaintiffs alleged that Dr. Knecht was negligent in relying upon ultrasound technology to determine Matthew's gestational age to the exclusion of the menstrual history provided by Mrs. Nealis. As a result, plaintiffs contend, he underestimated Matthew's gestational age, and his ensuing medical decisions—not to transfer Mrs. Nealis to OMH, to administer Demerol to Mrs. Nealis, but not Narcon to Matthew after birth to counteract the effect of Demerol, and not to attempt resuscitation of Matthew after birth—deprived Matthew of a chance of survival as contemplated by the loss-of-chance doctrine. We disagree and hold that the viability instruction insofar as it affected the jury's consideration of the loss-of-chance doctrine was not in error.

■ ¶ 47 In an action at law, a jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the jury verdict, this Court will not disturb the jury's decision or the trial court's judgment based thereon.[82] In a case tried to a jury, the credibility of witnesses and the weight and value of their testimony are questions exclusively for the jury to pass upon.[83] The sufficiency of the evidence to sustain a judgment in an action of legal cognizance is determined by an appellate court in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it.[84] A review of the record discloses abundant medical evidence from which the jury could have concluded that Matthew was a nonviable fetus of twenty to twenty-one weeks gestation, and that a non-

---

78. Defendants claim that plaintiffs failed to preserve the loss of chance issue for appeal by failing to object at trial to the Loss of Chance Instruction's inclusion of viability as a threshold question to that doctrine's applicability, by failing to raise the issue specifically in their petition in error, by failing to mention the issue in their appellate brief-in-chief, and by failing to quote or attach the Loss of Chance Instruction to their appellate brief. The Loss of Chance Instruction, which is contained in the record on appeal, states in part: "If you find that Matthew Nealis was not viable at the time of his birth, Plaintiffs are not entitled to recover for an increased risk of death and you should disregard this instruction." Viewing plaintiffs' contentions on appeal as a whole, we believe they adequately preserved for appeal the issue of loss of chance by contesting the use of viability as a threshold issue preventing the jury from any further deliberations, including loss of chance. Although they did not specifically state that the use of viability was erroneous in any instruction other than Instruc-

tion No. 7, it is quite clear that that is the import of their appeal when viewed in its entirety.

79. 1987 OK 69, 741 P.2d 467.

80. *Id.* at ¶ 23, at 474.

81. *Id.* at ¶ 25, at 475.

82. *Florafax International, Inc. v. GTE Market Resources, Inc.*, 1997 OK 7, ¶ 3, 933 P.2d 282, 287; *Hames v. Anderson*, 1977 OK 191, ¶ 11, 571 P.2d 831, 833.

83. *Florafax, supra*, note 82, at ¶ 3, at 287; *Pine Island RV Resort, Inc. v. Resort Management, Inc.*, 1996 OK 83, ¶ 18, 922 P.2d 609, 613.

84. *Florafax, supra*, note 82, at ¶ 3, at 287; *Park v. Security Bank and Trust Co.*, 1973 OK 72, ¶ 21, 512 P.2d 113, 118.

viable fetus of twenty to twenty-one weeks' gestation could not survive outside the womb. In light of that medical evidence, it is clear that Matthew did not have a significant chance of survival and that nothing Dr. Knecht did or did not do substantially contributed to Matthew's demise. Accordingly, the loss-of-chance doctrine is not applicable, and we affirm the judgment on jury verdict for Dr. Knecht. As did the Court of Civil Appeals, we also conclude that the alleged negligent acts or omissions of Dr. Knecht could not have been a cause of Matthew's death if Matthew was not viable at the time of his birth.

## IV

### JURY INSTRUCTION NO. 7 DID NOT TAINT THE JURY'S DELIBERATIONS ON PLAINTIFFS' PERSONAL INJURY CLAIM

█ ¶ 48 The jury deliberated separately on plaintiffs' two claims, deciding the wrongful death claim first and then taking up the personal injury claim. Despite the separate deliberations, plaintiffs contend that the jury's deliberations on their personal injury claim were fatally tainted by the court's use of Jury Instruction No. 22, which states: "In considering this claim, you should use the instructions previously supplied to you as well as these additional instructions." According to plaintiffs, the reference to the "instructions previously supplied" had the effect of incorporating into the personal injury deliberations the erroneous Instruction No. 7 regarding viability, thereby misleading the jury and requiring that judgment's reversal. We disagree.

¶ 49 After defining the term "viability", Instruction No. 7 states: "If you find that Matthew Nealis was not a viable fetus, you must return a verdict in favor of all of the defendants *on Plaintiffs' wrongful death claim....*" (emphasis added) By its very terms, Instruction No. 7 was limited to the wrongful death claim. Although Instruction No. 22 advised the jury to apply the jury charges previously given in the wrongful death phase of deliberations, we conclude that the jury in the personal injury phase would have conformed its deliberations to the self-limiting language in Instruction No. 7, which *explicitly made that instruction applicable solely to the wrongful death claim.* Inasmuch as we discern here no reasonable indication that the jury was misled by the erroneous instruction or that a violation of a substantial constitutional or statutory right occurred, we decline to reverse the jury's verdict.

## V

### THE TRIAL COURT MUST DECIDE ON REMAND WHETHER THE DOCTRINE OF ISSUE PRECLUSION BARS FURTHER PROCEEDINGS ON PLAINTIFFS' WRONGFUL DEATH CLAIM

█ ¶ 50 Drs. Baird and Hartwig contend that by its verdict in their favor in plaintiffs' personal injury action, the jury absolved them of any negligence in connection with Mrs. Nealis's prenatal care. They argue that under the doctrine of issue preclusion/collateral estoppel,[85] the personal injury judgment, if affirmed, bars any further proceedings against them on the wrongful death claim because the latter claim is based on the same acts of negligence as the former. Defendants urge this court to rule on their preclusion plea in the event that we affirm the verdict in their favor on the personal injury claim. Although we do affirm the judgment for the defendants on the personal injury claim, we must decline to pass on whether that judgment bars further proceedings on plaintiffs' wrongful death claim.

█ ¶ 51 Under the doctrine of issue preclusion, once a court has decided an issue

---

85. The term issue preclusion has been adopted by the RESTATEMENT OF JUDGMENTS (SECOND) § 27, Comment b (1982). The use of the more descriptive term issue preclusion was advanced in the works of Professor Allan D. Vestal, *Res Judicata/Preclusion,* PERSONAL INJURY ANNUAL (1969); *Res Judicata/Preclusion: Expansion,* 47 S. Cal. L.Rev. 357 (1974); *State Court Judgment as Preclusive in Section 1983 Litigation in a Federal Court,* 27 OKLA. L.REV. 185 (1974). *See, Underside v. Lathrop,* 1982 OK 57, n. 8, 645 P.2d 514, 517, n. 8; *Veiser v. Armstrong,* 1984 OK 61, n. 7, 688 P.2d 796, 799, n. 7.

of fact or law necessary to its judgment, the same parties or their privies may not relitigate the issue in a suit brought for a different claim.[86] Issue preclusion is an affirmative defense and must be pleaded and proved.[87] Although appellate application of preclusion is not unheard of,[88] it is rare because the principles governing preclusion's invocation have practical applicability almost exclusively in the context of pleading and practice at the trial level. Issue preclusion prevents relitigation of facts and issues *actually litigated* and *necessarily determined* in an earlier proceeding between the same parties or their privies.[89] An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined....[90] An issue is necessarily determined if the judgment would not have been rendered but for the determination of that issue.[91] Additionally, the party against whom issue preclusion is interposed must have had a "full and fair opportunity" to litigate the critical issue in the earlier case.[92]

■ ¶ 52 The verdict rendered on plaintiffs' personal injury claim was general. A general verdict is that by which a jury pronounces generally upon all or any of the issues in favor of either the plaintiff or the defendant.[93] In a personal injury action in which a general verdict has been rendered, the verdict may indicate a finding that the defendant was not negligent, but it may just as readily reflect the jury's determination that the plaintiff was contributorily negligent to a degree sufficient to relieve the defendant of liability,[94] or that the jury failed to find a causal relationship between the claimed negligence and the plaintiff's injury, or that plaintiff had failed to establish an injury or damages. While it is true that a general verdict includes within its terms a finding favorable to the prevailing party upon every material issuable fact,[95] a general verdict cannot be said to establish any one of these issues or all of them for purposes of preclusion.[96] Precisely which issues were actually litigated and necessarily determined in a prior action and whether the party against

86. *Ouellette v. State Farm Mutual Automobile Ins. Co.,* 1994 OK 79, n. 8, 918 P.2d 1363, 1365, n. 8; *National Diversified Business Services, Inc. v. Corporate Financial Opportunities, Inc.,* 1997 OK 36, ¶ 11, 946 P.2d 662, 666; *Chambers v. City of Ada,* 1995 OK 24, ¶ 9, 894 P.2d 1068, 1072, n. 5; *Wilson v. Kane,* 1993 OK 65, ¶ 8, 852 P.2d 717, 722, n. 23; *Veiser v. Armstrong, supra* note 85 at ¶ 8, at 800, n. 9. *See also Robinson v. Volkswagenwerk AG,* 56 F.3d 1268, 1272 (10th Cir.1995); Restatement of Judgments (Second) § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.").

87. 12 O.S.1991 § 2008(C)(16); *James v. Unknown Trustees, Etc.,* 203 Okla. 312, 220 P.2d 831, 833 (1950).

88. *Southard v. Southard,* 305 F.2d 730 (2nd Cir. 1962) (citing considerations of judicial economy, appellate court affirmed order of dismissal where the complaint revealed facts which showed that the action was barred by res judicata even though defendant raised that defense for the first time in the appellate court: if the case was remanded, the court would be compelled to grant the defendant's inevitable Rule 12(b)(6) motion on the grounds of res judicata).

89. *Carris v. John R.Thomas and Associates, P.C.,* 1995 OK 33, ¶ 11, 896 P.2d 522, 528.

90. 1 Restatement (Second) Judgements, § 27, comment (d) (1982).

91. F. James, Jr. & G. Hazzard, Jr., Civil Procedure (3rd ed.1985) § 11.16 and § 11.19.

92. *Underside v. Lathrop,* 1982 OK 57, n. 6, 645 P.2d 514, 516, n. 6.

93. 12 Okla. Stat.1991 § 587.

94. The contributory negligence of the mother, if any, may not be imputed to the child to defeat the claim brought for its wrongful death. *Strong v. Allen,* 1989 OK 17, ¶ 7, 768 P.2d 369, 370.

95. *Morgan v. Galilean Health Enterprises, Inc.,* 1998 OK 130, n. 8, 977 P.2d 357, 361, n. 8; *Garrison v. Bonham,* 207 Okl. 599, 251 P.2d 790, 793 (1953); *J.R. Watkins Co. v. Chapman,* 197 Okl. 466, 172 P.2d 768, 769–770 (1946).

96. The presumption that by a general verdict, a jury has decided "every issue in favor of the prevailing party" operates in the appellate process to protect a verdict from a claim of trial error where the verdict may have been reached improperly, but may also have been reached without error. It does not decide every issue in the prevailing party's favor for non-appellate purposes such as preclusion. *See, Dowling v. Finley Associates, Inc.,* 248 Conn. 364, 727 A.2d 1245, 1252.

whom issue preclusion is interposed had in the earlier case a "full and fair opportunity" to litigate the critical issue are questions to be initially determined by the trial court. They are precisely the kinds of first-instance decisions of disputed law or fact issues which an appellate court is not authorized to make.[97] Since defendants' preclusion defense has neither been pressed nor earlier assessed at nisi prius, we cannot craft an initial decision on an unresolved question and then direct that it be followed on remand. Defendants' preclusion defense must first be tendered to and decided by the trial court.[98]

¶ 53 Additionally, issue preclusion must rest upon a final prior judgment.[99] A final judgment is one in which no appeal has been perfected within the time allotted by law or one in which an appeal has been properly perfected and acted upon by the highest court whose review has been sought.[100] The preclusive effect of the judgment on plaintiffs' personal injury claim *will not arise until after our decision in this case is delivered and the mandate issues.* Only then will the judgment in this cause become final. Hence, defendants must await the finality of the reviewing process and then, at the appropriate time and in the appropriate forum and manner, raise the personal injury claim's outcome as their affirmative preclusion defense.

## VI

## STATUTES MANDATING THE STANDARD OF CARE OWED TO A VIABLE FETUS DURING THE PROCESS OF ABORTION AND CREATING A PRESUMPTION OF VIABILITY ARE NOT APPLICABLE TO BABIES NATURALLY BORN

¶ 54 Plaintiffs argued on appeal that the trial court should have instructed the jury on the provisions of 63 O.S.1991 § 1–732.[101] Under that statute an unborn child must be presumed viable if more than twenty-four (24) weeks have elapsed since the probable beginning of the last menstrual period of the pregnant woman, based upon a history provided by her, unless it is the judgment of the person performing the abortion that the particular child is not viable and he or she certifies in writing the medical basis for that judgment.[102] The cited statute also, with some qualifications, mandates the rendering of reasonable medical care designed to preserve the life and health of a viable unborn child who is aborted in the same manner as if he or she had been born naturally.[103] The Court of Civil Appeals held

**97.** *YWCA v. Melson*, 1997 OK 81, n. 1, 944 P.2d 304, 306, n. 1; *Bivins v. State ex rel. Okl. Mem. Hosp.*, 1996 OK 5, ¶ 19, 917 P.2d 456, 464.

**98.** *Bivens, supra,* note 97 at ¶ 19, at 464.

**99.** *Panama Processes, S.A. v. Cities Service Co.,* 1990 OK 66, ¶ 11, 796 P.2d 276, 283; *Benham v. Plotner,* 1990 OK 64, ¶ 5, 795 P.2d 510, 512.

**100.** *Grider v. USX Corp.,* 1993 OK 13, ¶ 11, 847 P.2d 779, 784; *Benham v. Plotner,* 1990 OK 64, ¶ 5, 795 P.2d 510, 512; *Depuy v. Hoeme,* 1989 OK 42, n. 23, 775 P.2d 1339, 1343, n. 23; *State ex rel. Derryberry v. Kerr–McGee Corp.,* 1973 OK 132, ¶ 32, 516 P.2d 813, 820; *Ellison v. Gray,* 1985 OK 35, ¶ 18, 702 P.2d 360, 367; *Powell v. Chastain,* 1961 OK 28, ¶ 0, 359 P.2d 336, 336.

**101.** The provisions of 63 O.S.1991 § 1–732 make it the crime of homicide to perform an abortion after an unborn child has reached the stage of viability, except where the abortion is performed to prevent the death or to preserve the health of the pregnant woman. Recognizing that the moment an unborn child attains viability defies pre-

cise reckoning, the Legislature created a presumption regarding viability.

**102.** The provisions of 63 O.S.1991 § 1–732(B) provide:

"An unborn child shall be presumed to be viable if more than twenty-four (24) weeks have elapsed since the probable beginning of the last menstrual period of the pregnant woman, based upon either information provided by her or by an examination by her attending physician. If it is the judgment of the attending physician that a particular unborn child is not viable where the presumption of viability exists as to that particular unborn child, then he shall certify in writing the precise medical criteria upon which he has determined that the particular unborn child is not viable before an abortion may be performed or induced."

**103.** The provisions of 63 O.S.1991 § 1–732(E) provide:

"An abortion of a viable unborn child shall be performed or induced only when there is in attendance a physician other than the physi-

that the statutory presumption and the statutorily mandated duty to render reasonable medical care enacted to operate in the context of abortion do not apply to a spontaneous miscarriage or natural, premature birth. *We agree.*

▬▬▬▬ ¶ 55 When determining whether a statute applies to a given set of facts, this court's analysis focuses on the intent of the Legislature.[104] It is presumed that the lawmaking body has expressed its intent in a statute and that it intended what it so expressed.[105] A statute should be interpreted to attain that purpose and end.[106] Only where the legislative intent cannot be ascertained from the language of the statute, such as instances of ambiguity or conflict with other statutes, are rules of statutory construction employed.[107] When employed, rules of statutory construction likewise have as their primary goal ascertainment of the legislature's intent.[108] That intent is to be gleaned from the statute in light of its general purpose and object.[109] There is no room in this case for statutory construction. This is so because

> cian performing or inducing the abortion who shall take control of and provide immediate medical care for the child. During the performance or inducing of the abortion, the physician performing it, and subsequent to it, the physician required by this section to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent *with the procedure used, to preserve the life* and health of the child, in the same manner as if the child had been born naturally or spontaneously. The requirement of the attendance of a second physician may be waived when in the best judgment of the attending physician a medical emergency exits and further delay would result in a serious threat to the life or physical health of the pregnant woman. Provided that, under such emergency circumstances and waiver, the attending physician shall have *the duty to take all reasonable steps* to preserve the life and health of the child before, during and after the abortion procedure, unless such steps shall, in his best medical judgment, present a significantly greater danger to the life or health of the pregnant woman."

**104.** *Cooper v. State ex rel. Dep't. of Public Safety,* 1996 OK 49, ¶ 10, 917 P.2d 466, 468.

**105.** *TXO Production Corp. v. Okl. Corp. Comm'n,* 1992 OK 39, ¶ 7, 829 P.2d 964, 969.

**106.** *Id.*

the legislative intent can be ascertained from the plain language of section 1–732.

¶ 56 Section 1–732 defines the circumstances under which an abortion constitutes the crime of homicide, while leaving constitutionally protected abortions free from state interference. The statute is clearly intended to apply only to unborn children who are to be aborted. Plaintiffs would have us extract from the statute portions which they believe ought to apply to a spontaneous delivery. But there is nothing in the language or object of this penal enactment to support this construction. *The intent of the legislature in enacting this statute was to criminalize certain abortions and not to shift the burden of producing evidence on the issues of viability and the appropriate standard of care in a wrongful death action arising out of a spontaneous delivery.*

¶ 57 We also reject the notion that section 1–732 should be extended by analogy to instances of spontaneous miscarriage.[110] Section 1–732(E) provides:

**107.** *Cooper, supra,* note 104, at ¶ 10, at 468; *Cox v. Dawson,* 1996 OK 11, ¶ 5, 911 P.2d 272, 276 ("Under our case law, we hesitate to construe any statute that appears clear and unambiguous."); *Fuller v. Odom,* 1987 OK 64, ¶ 4, 741 P.2d 449, 452.

**108.** The primary objective in statutory construction is to determine the legislative intent. *TXO Production Corp., supra,* note 105 at ¶ 7, at 968–69; *Ledbetter v. Alcoholic Bev. Laws Enforcement,* 1988 OK 117, ¶ 7, 764 P.2d 172, 179; *Humphrey v. Denney,* 1988 OK 69, ¶ 8, 757 P.2d 833, 835; *Hess v. Excise Board of McCurtain County,* 1985 OK 28, ¶ 6, 698 P.2d 930, 932; *Riffe Petroleum Co. v. Great Nat. Corp., Inc.,* 1980 OK 112, ¶ 7, 614 P.2d 576, 579; *Lekan v. P & L Fire Protection Co.,* 1980 OK 56, ¶ 6, 609 P.2d 1289, 1292; *Midwest City v. Harris,* 1977 OK 7, ¶ 6, 561 P.2d 1357, 1358.

**109.** *TXO Production Corp. supra,* note 105 at ¶ 7, at 968.

**110.** "Analogy originally described the mathematical concept of proportion, or of the agreement of (mathematical) ratios. It was used for kindred purposes in classical Greek philosophy, and ... by grammarians of the Alexandrine school to denote the derivation of rules of grammar through extrapolation from patterns of known usage." Hans W. Baade, *The Casus Omissus: A Pre-History of Statutory Analogy,* 20 Syracuse J Int'l L & Comm. 45, 46–47 (1994). Analogy as a

". . . . During the performance of inducing of the abortion, the physician performing it, . . . shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the child, *in the same manner as if the child had been born naturally or spontaneously . . . .*" (emphasis added)

Plaintiffs refer us to the provisions of 59 O.S.1991 §§ 524, which similarly confer upon an infant prematurely born alive during an abortion procedure the same right to medical care as that afforded an infant of similar medical status prematurely, but naturally born alive.[111] Plaintiffs argue that if an aborted baby must be treated in the same manner as a naturally born baby, then conversely, the Legislature must have intended that a child born naturally or spontaneously must be afforded the same care as is afforded by statute to aborted babies. An interpretation restricting the presumption and duties to viable, or presumptively viable, babies born alive during an abortion procedure would, plaintiffs urge, create the absurd result that where the pregnant woman and abortionist want the baby to die, efforts are statutorily mandated to save its life, while a baby whose parents want it to live is not provided with the same life-saving treatment.

¶ 58 The statutes cited by plaintiffs do not in our view set up an equation between the rights of an aborted infant and a naturally born infant, but rather set forth a comparison in which the right to medical care of a naturally born infant is used as the base line for the medical care which must be afforded to an aborted infant of similar medical status. This protection for aborted fetuses is neces-sary because the termination of its life is the object of the abortion procedure. It is not necessary for an infant born under normal circumstances where the preservation of its life is desired by both the physician and the parents.

¶ 59 Plaintiffs argue that a rejection of their position gives an aborted child greater access to medical care than was available to Matthew Nealis. We also reject that notion. Section 1–732 provides that the abortionist may avoid the viability presumption if in his or her judgment the child is not viable and he or she certifies in writing the medical criteria upon which that judgment is based. Since the requirement in subsection (E) that reasonable medical care be provided applies only to viable unborn children, the certification of nonviability based on medical criteria appears to remove the abortion from the strictures of section 1–732(E) and no medical care is required for the child. The medical evidence produced in this case that Matthew was not viable was sufficient to support a certification that Matthew's gestational age was less than twenty-four (24) weeks, thereby avoiding the presumption and removing any requirement of medical care. We conclude that Matthew was not denied any protection to which he was entitled.

## VII

**THE COURT OF CIVIL APPEALS' OPINION, INSOFAR AS IT RELATES TO THE JURY INSTRUCTIONS' INCLUSION OR EXCLUSION OF CERTAIN DEFINITIONS, MUST BE LEFT UNDISTURBED**

¶ 60 On appeal, plaintiffs argued that the trial court erred in refusing to give their

---

method of legal reasoning in common-law cases is traditionally and without hesitation applied to case-law. The same degree of persuasive force has not generally been accorded to statutes, which have traditionally been restricted to their express terms. Robert F. Williams, *Statutes as Sources of Law Beyond Their Terms in Common-Law Cases*, 50 GEO. WASH. L. REV. 554, 555 (1982). Nevertheless, some use of statutory analogy is common. For example, the law of torts, in large part a common-law development, incorporates aspects of criminal and administrative statutes. *Id.* at 556. This court has reasoned by analogy from the statute of limitations governing a certain cause of action to the applicability of laches in a mandamus proceeding involving a similar

cause of action. *Stonecipher v. District Ct. of Pittsburg County*, 1998 OK 122, ¶ 9, 970 P.2d 182; *Hutchman v. Parkinson*, 199 Okl. 494, 187 P.2d 999, 1002 (Okla.1947).

**111.** The provisions of 59 O.S.1991 § 524 are not found in the public health code, but in that title of the statutes governing the medical profession. Its provisions state:

"The rights to medical treatment of an infant prematurely born alive in the course of an abortion shall be the same as the rights of an infant of similar medical status prematurely born."

requested jury instruction on the statutory definition of "live birth" and "death." They also urged as error the trial court's chosen definition of the term "viable," appearing in Instruction No. 7. The Court of Civil Appeals held that plaintiffs' requested instructions defining "live birth" and "death" would have helped the jury in deciding whether Matthew was stillborn or born alive and, therefore, should have been given. As for the term "viable," the Court of Civil Appeals held that the definition given in Instruction No. 7 was an accurate representation of the meaning of the term and was consistent with the definition of viable used by this court in *Evans.*[112]

■ ¶ 61 Neither party has asked this court to review the decision of the Court of Civil Appeals regarding these definitions. Extant jurisprudence holds that corrective relief from issues resolved by the Court of Civil Appeals, but not explicitly pressed for certiorari review, is beyond this court's power to grant.[113] The question of error in definitions submitted by the jury instructions is now settled law of the case. That portion of the opinion of the Court of Civil Appeals deciding the correctness of definitions remains undisturbed by this opinion.[114]

## VIII

### SUMMARY

¶ 62 Plaintiffs pressed two claims below, both of which resulted in jury verdicts for the defendants. In the first claim, in which plaintiffs sought damages for personal injuries resulting from the prenatal care provided to Mrs. Nealis by Drs. Baird and Hartwig, we discern no error requiring reversal of the jury's verdict that exonerates the two defendants. We hence affirm that portion of the judgment.

112. 1976 OK 64, n. 3, 550 P.2d 924, 928, n. 3.

113. *Nichols v. Mid–Continent Pipe Line Co.,* 1996 OK 118, ¶ 23, 933 P.2d 272, 281;*Hough v. Leonard,* 1993 OK 112, ¶ 15, 867 P.2d 438, 445. *See also, Barnett v. Barnett,* 1996 OK 60, ¶ 13, 917 P.2d 473, 477.

114. The settled-law-of-the-case doctrine operates to bar relitigation of issues which are finally

¶ 63 In the second claim, for the wrongful death of baby Matthew Nealis, we decide an issue of first impression—whether Oklahoma's wrongful death statute encompasses an action for the death of a nonviable child born alive. We hold that live birth, regardless of viability, marks the point at which a human fetus must be recognized as a person for purposes of the wrongful death statute. We view live birth as an unassailable point at which legal rights must be said to attach to the human person. With this holding, we take one more step along the road first traveled by Lord Campbell's Act and its American successors.

¶ 64 Having so held, we nevertheless recognize that the three physicians whose negligence was alleged to be the cause of Matthew's death do not all stand in precisely the same position. With respect to their wrongful death claim against Drs. Baird and Hartwig, plaintiffs are entitled by today's pronouncement to have a jury determine whether a negligent act or omission by either or both of those physicians was a direct cause of Matthew's death. Matthew's nonviability at the time of his birth will not adversely affect plaintiffs' ability to prove the elements of their negligence claim against these two doctors. Hence, as to them, we reverse the judgment on jury verdict in the wrongful death claim.

¶ 65 With respect to Dr. Knecht, the physician on call in the emergency room during Mrs. Nealis's labor and delivery, we hold that any alleged negligent acts or omissions attributed to him *could not have been a cause of Matthew's death* if Matthew was not viable at the time of his birth. Accordingly, we affirm the judgment on jury verdict for Dr. Knecht.

¶ 66 We also recognize by this opinion that the provisions of 63 O.S.1991 § 1–732 and 59

settled by an appellate opinion or those that the aggrieved party has failed timely to raise in the course of appellate contest. *Jackson v. Jones,* 1995 OK 131, n. 37, 907 P.2d 1067, 1074 n. 37; *Morrow Dev. Corp. v. American Bank and Trust Co.,* 1994 OK 26, n. 2, 875 P.2d 411, 413, n. 2; *Barnett v. Barnett,* 1996 OK 60, ¶ 13, 917 P.2d 473, 477.

O.S.1991 § 524 reflect the legislature's concern for the potential loss of human life during an abortion. Both of these sections hence use the standard of medical care due to a naturally born infant as the reference point for the care required for an aborted infant of similar medical status. In a natural birth, the determination of viability and the applicable standard of care are best left to the experts' medical judgment to be exercised on a case-by-case basis.

¶ 67 Finally, we decline to pass—as a court of first instance—on the appellate plea of issue preclusion, leaving it to the trial court to decide upon remand whether further proceedings on plaintiffs' wrongful death claim are barred by that doctrine as a result of today's affirmance of the judgment on jury verdict for the two physician-defendants on plaintiffs' personal injury claim.

¶ 68 **THE COURT OF CIVIL APPEALS' OPINION IS VACATED IN PART AND LEFT UNDISTURBED IN PART; THE JUDGMENT ON JURY VERDICT IS AFFIRMED IN PART AND REVERSED IN PART, AND THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS PRONOUNCEMENT**

¶ 69 HARGRAVE, V.C.J., LAVENDER, OPALA, and WATT, JJ., and LUMPKIN, S.J. (sitting by designation in lieu of BOUDREAU, J., who certified his disqualification), concur;

¶ 70 SUMMERS, C.J., concurs in part and dissents in part;

¶ 71 HODGES, J., and STRUBHAR, S.J. (sitting by designation in lieu of KAUGER, J., who recused) and JOHNSON, S.J. (sitting by designation by reason of the judicial vacancy created by the death of ALMA WILSON, J.), dissent.

SUMMERS, C.J., concurring in part and dissenting in part.

¶ 1 I dissent from parts III and V for the reason that I agree in large part with the views expressed by Justice Hodges on the necessity for viability of the fetus. I concur in parts I, II, IV, VI, VII, and that part of VIII other than in its references to the viability issue.

HODGES, J. with whom STRUBHAR, S.J., and JOHNSON, S.J., join dissenting:

¶ 1 I respectfully dissent from today's departure from the "viability" standard to one of "live birth." I would adhere to the "viability" standard and refuse to extend a wrongful death recovery to the miscarriage of a non-viable fetus.

¶ 2 Until today, the standard utilized by this Court was the one adopted in most jurisdictions, "viability". Despite a few decisions to the contrary, there is general agreement that a wrongful death action cannot be maintained for the loss of a non-viable fetus. See Sheldon R. Shapiro, Annotation, *Right to Maintain Action or to Recover Damages for Death of Unborn Child*, 84 A.L.R.3d 411 (1978). Accordingly, Oklahoma courts have adhered to the "viability" standard, allowing recovery only for the loss of a viable fetus. See *Evans v. Olson*, 550 P.2d 924 (Okla.1976); *Guyer v. Hugo Publishing Co.*, 830 P.2d 1393 (Okla.Ct.Civ.App.1992). This Court and most jurisdictions have not previously considered whether the "viability" standard is to be supplanted in the presence of conflicting evidence concerning live birth. However, sound policy considerations weigh in favor of applying "viability" to determine this matter.

¶ 3 Viability measures the ability of a miscarried fetus to sustain life outside the mother's womb. *Evans*, 550 P.2d at 928 fn. 3. It recognizes that although it is clinically possible for a non-viable infant to show signs of life as recognized by a layman, i.e., heartbeat, breathing, brain-wave activity, it is medically accepted that a non-viable infant "lacks sufficient lung tissue to permit survival." Bodkin, *Delivery Room Decisions for Tiny Infants: An Ethical Analysis*, 1 J. Clinical Ethics, 306, 307 (Winter 1990). The "viability" standard merely recognizes that a non-viable fetus cannot and will not survive with or without medical intervention.

¶ 4 The "live birth" standard, on the other hand, rests on an arbitrary distinction. It bases recovery on whether a non-viable fetus dies shortly before or shortly after miscarriage. Inevitable death from prematurity

should not present a situation in which live birth becomes the functional equivalent of viable for purposes of a wrongful death action.[1]

¶5 Maintaining the "viability" standard would also be consistent with the Oklahoma Court of Criminal Appeals' adoption of a "viability" standard to determine which fetuses will be afforded the protection of Oklahoma's homicide statute. In *Hughes v. State*, 868 P.2d 730 (Okla.Ct.Crim.App.1994), that Court supported its decision to abandon a "born alive" requirement in favor of a "viability" standard with this Court's decision in *Evans*, 550 P.2d 924. It noted that "consistency is certainly desirable" in the reasoning of the Oklahoma Supreme Court and the Oklahoma Court of Criminal Appeals. In the five years since the *Hughes* opinion, nothing has made consistency in the reasoning of these two courts any less desirable. The determination of whether a defendant wrongfully caused the death of a fetus should be guided by the threshold question of "viability" whether the cause is civil or criminal.

¶6 Today's "live birth" analysis is not needed to resolve this matter. At trial, the issues of live birth and viability were hotly contested and the evidence was conflicting. Plaintiffs' evidence supported a theory that the fetus was 24—25 weeks old, viable, and born alive. Defendants' evidence was that the fetus was 20—21 weeks old, non-viable, and stillborn. The jury's verdict in favor of defendants indicates that it (1) believed defendants' version of the facts concerning live birth and viability or that (2) defendants performed no negligent acts or (3) both. In any of these instances, none of these defendants should be required to face a new trial.

¶7 The challenged instruction accurately stated the applicable standard, definitions and law at the time it was given. Only today's change in the law makes the challenged instruction inadequate. I would retain "viability" as the threshold question and affirm the judgment entered upon the jury's verdict.

---

1. Rejecting a live birth requirement, the Supreme Court of Alabama noted:

   [I]t is illogical to allow liability to depend on whether death from fatal injury occurred before or after live birth. Reconciliation of the proposition that if death occurred after live birth a cause of action exists, but if death occurs prior thereto a cause of action does not exist, is extremely difficult at best. The proposition's inconsistency is best exemplified in the situation involving the death of twins who are wrongfully injured during pregnancy. To allow recovery to the one born alive, who subsequently dies, and to deny recovery to the still-born who was injured in the same accident is obviously ludicrous.
   *Eich v. Town of Gulf Shores*, 293 Ala. 95, 300 So.2d 354, 357 (1974).