2003 OK CIV APP 97

**Rita LAWS, Plaintiff/Appellant,**

v.

**STATE of Oklahoma ex rel., OKLAHOMA DEPARTMENT OF HUMAN SERVICES and Howard Hendrick, Defendants/Appellees.**

**No. 96,740.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Aug. 5, 2003.

Certiorari Denied Nov. 10, 2003.

Kayla A. Bower, Joy J. Turner, Oklahoma Disability Law Center, Inc., Oklahoma City, OK, for Plaintiff/Appellant.

Travis Smith, Assistant General Counsel, Oklahoma Department of Human Services, Oklahoma City, OK, for Defendants/Appellees.

Kent Markus, Columbus, OH, for Amicus Curiae, The Dave Thomas Center, for Adoption Law.

Opinion by KEITH RAPP, Judge:

¶1 The trial court plaintiff, Rita Laws (Laws), an adoptive parent of G.L., appeals the trial court decision sustaining in part the decision of the Oklahoma Department of Human Services (State) to deny adoption assistance benefits for G.L. to Laws. The State appeals the same trial court decision which overruled in part the State's administrative decision denying adoption assistance benefits.

## BACKGROUND

¶2 Although this case comes for review in the context of the very real concerns surrounding the adoption of children with special needs, the defining issue herein is one of statutory construction. It is undisputed that G.L. qualifies as a special needs child.

¶3 Congress enacted the Adoption and Child Welfare Act of 1980 to provide financial assistance to parents who adopt children with special needs. 1980 U.S.C.C.A.N. 1448, 1450. With regard to the payments of financial assistance 42 U.S.C. § 673(a)(3), provides, in part, that payments may not "exceed the foster care maintenance payment which would have been paid during the period if the child with respect to whom the adoption assistance payment is made had been in a foster family home." [1] This has been named the IV–E Program.

---

1. The text of the statute involved here, 42 U.S.C. § 673, provides:

   (a) **Agreements with adoptive parents of children with special needs; State payments; qualifying children; amount of payments; changes in circumstances; placement period prior to adoption; nonrecurring adoption expenses**

   (1)(A) Each State having a plan approved under this part shall enter into adoption assistance agreements (as defined in section 675(3) of this title) with the adoptive parents of children with special needs.

   (B) Under any adoption assistance agreement entered into by a State with parents who adopt a child with special needs, the State—

   (i) shall make payments of nonrecurring adoption expenses incurred by or on behalf of such parents in connection with the adoption of such child, directly through the State agency or through another public or nonprofit private agency, in amounts determined under paragraph (3), and

   (ii) in any case where the child meets the requirements of paragraph (2), may make adoption assistance payments to such parents, directly through the State agency or through another public or nonprofit private agency, in amounts so determined.

   (2) For purposes of paragraph (1)(B)(ii), a child meets the requirements of this paragraph if such child—

   (A)(i) at the time adoption proceedings were initiated, met the requirements of section 606(a) of this title or section 607 of this title (as such sections were in effect on July 16, 1996) or would have met such requirements except for his removal from the home of a relative (specified in section 606(a) of this title (as so in effect)), either pursuant to a voluntary placement agreement with respect to which Federal payments are provided under section 674 (or 603 (as such section was in effect on July 16, 1996)) of this title or as a result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child,

   (ii) meets all of the requirements of subchapter XVI of this chapter with respect to eligibility for supplemental security income benefits, or

   (iii) is a child whose costs in a foster family home or child-care institution are covered by the foster care maintenance payments being made with respect to his or her minor parent as provided in section 675(4)(B) of this title,

   (B)(i) would have received aid under the State plan approved under section 602 of this title (as in effect on July 16, 1996) in or for the

month in which such agreement was entered into or court proceedings leading to the removal of such child from the home were initiated, or

(ii) (I) would have received such aid in or for such month if application had been made therefor, or (II) had been living with a relative specified in section 606(a) of this title (as in effect on July 16, 1996) within six months prior to the month in which such agreement was entered into or such proceedings were initiated, and would have received such aid in or for such month if in such month he had been living with such a relative and application therefor had been made, or

(iii) is a child described in subparagraph (A)(ii) or (A)(iii), and

(C) has been determined by the State, pursuant to subsection (c) of this section, to be a child with special needs.

The last sentence of section 672(a) of this title shall apply, for purposes of subparagraph (B), in any case where the child is an alien described in that sentence.

Any child who meets the requirements of subparagraph (C), who was determined eligible for adoption assistance payments under this part with respect to a prior adoption, who is available for adoption because the prior adoption has been dissolved and the parental rights of the adoptive parents have been terminated or because the child's adoptive parents have died, and who fails to meet the requirements of subparagraphs (A) and (B) but would meet such requirements if the child were treated as if the child were in the same financial and other circumstances the child was in the last time the child was determined eligible for adoption assistance payments under this part and the prior adoption were treated as never having occurred, shall be treated as meeting the requirements of this paragraph for purposes of paragraph (1)(B)(ii).

(3) The amount of the payments to be made in any case under clauses (i) and (ii) of paragraph (1)(B) *shall be determined through agreement between the adoptive parents and the State or local agency administering* the program under this section, which shall take into consideration the circumstances of the adopting parents and the needs of the child being adopted, and may be readjusted periodically, with the concurrence of the adopting parents (which may be specified in the adoption assistance agreement), depending upon changes in such circumstances. However, in no case may the amount of the adoption assistance payment made under clause (ii) of paragraph (1)(B) exceed the foster care maintenance payment which would have been paid during the period if the child with respect to whom the adoption assistance payment is made had been in a foster family home.

(4) Notwithstanding the preceding paragraph, (A) no payment may be made to parents with respect to any child who has attained the age of eighteen (or, where the State determines that the child has a mental or physical handicap which warrants the continuation of assistance, the age of twenty-one), and (B) no payment may be made to parents with respect to any child if the State determines that the parents are no longer legally responsible for the support of the child or if the State determines that the child is no longer receiving any support from such parents. Parents who have been receiving adoption assistance payments under this section shall keep the State or local agency administering the program under this section informed of circumstances which would, pursuant to this subsection, make them ineligible for such assistance payments, or eligible for assistance payments in a different amount.

(5) For purposes of this part, individuals with whom a child (who has been determined by the State, pursuant to subsection (c) of this section, to be a child with special needs) is placed for adoption in accordance with applicable State and local law shall be eligible for such payments, during the period of the placement, on the same terms and subject to the same conditions as if such individuals had adopted such child.

(6)(A) For purposes of paragraph (1)(B)(i), the term "nonrecurring adoption expenses" means reasonable and necessary adoption fees, court costs, attorney fees, and other expenses which are directly related to the legal adoption of a child with special needs and which are not incurred in violation of State or Federal law.

(B) A State's payment of nonrecurring adoption expenses under an adoption assistance agreement shall be treated as an expenditure made for the proper and efficient administration of the State plan for purposes of section 674(a)(3)(E) of this title.

(b) Aid for dependent children; assistance for minor children in needy families

(1) For purposes of subchapter XIX of this chapter, any child who is described in paragraph (3) is deemed to be a dependent child as defined in section 606 of this title (as in effect as of July 16, 1996) and deemed to be a recipient of aid to families with dependent children under part A of this subchapter (as so in effect) in the State where such child resides.

(2) For purposes of subchapter XX of this chapter, any child who is described in paragraph (3) is deemed to be a minor child in a needy family under a State program funded under part A of this subchapter and deemed to be a recipient of assistance under such part.

(3) A child described in this paragraph is any child—

(A)(i) who is a child described in subsection (a)(2) of this section, and

(ii) with respect to whom an adoption assistance agreement is in effect under this section (whether or not adoption assistance payments are provided under the agreement or are being made under this section), including any such child who has been placed for adoption in accordance with applicable State and local law

¶ 4 Oklahoma's statute, enacted in response to the federal scheme, was codified as 10 O.S.2001, §§ 7510–1.2—7510–1.5. The statute, in Section 7510–1.5(A), provided, in part:

A.  When a parent or parents are found and approved for adoption of a child who is certified as eligible for subsidy, and before the final decree of adoption is issued, there must be a written agreement between the family entering into the subsidized adoption and the Department of Human Services.   Adoption subsidies in individual cases may commence with the adoption placement or at the appropriate time after the adoption decree, and shall be based on the needs of the child as well as the availability of other resources to meet the child's needs.   The subsidy may be for special services only, or for money payments, and either for a limited period, or for a long term, or for any combination of the foregoing.   The amount of the time-limited or long-term subsidy may in no case exceed that which would be allowable from time to time for such child under foster family care, or in the case of a special service, the reasonable fee for the service rendered.

¶ 5 The State, via its agency, DHS, in implementing the IV–E program utilized a two-tier system whereby payments to adoptive parents were less than payments to foster parents so that adoptive parents were precluded from negotiating for assistance equal to that provided to a foster parent. Also, the State imposed additional criteria before an adoptive parent could be eligible. Under the State's view, the lower payment schedule was valid because the statute permitted any payment so long as the amount did not exceed the foster parent payment and the State has the authority to establish a rate structure, subject to the foster care limit.

¶ 6 Thus, the first issue necessary for review is whether the excerpted provision of the federal Act is merely a cap on payments, as argued by the State.   For reasons herein set out, this Court holds it is not.

¶ 7 Laws, contra to the State's position, asserts she was entitled to negotiate for a payment up to the amount available to foster parents.   She contends the federal law authorizes her to be able to negotiate *up to the foster parent level* and that any limit impairing that authority is unlawful.

¶ 8 G.L., the special needs child adopted by Laws, was born on December 9, 1992.   The adoption became final January 1, 1999.[2]   Under the scheme of assistance established by the State, a higher level of assistance to a special needs child would become available upon a child reaching age six.   Thus, Laws initiated a request for assistance in August of 1998, and renewed the request in November

Note 1—Continued
(whether or not an interlocutory or other judicial decree of adoption has been issued), or (B) with respect to whom foster care maintenance payments are being made under section 672 of this title.
(4) For purposes of paragraphs (1) and (2), a child whose costs in a foster family home or child-care institution are covered by the foster care maintenance payments being made with respect to the child's minor parent, as provided in section 675(4)(B) of this title, shall be considered a child with respect to whom foster care maintenance payments are being made under section 672 of this title.
(c) Children with special needs
For purposes of this section, a child shall not be considered a child with special needs unless—
(1) the State has determined that the child cannot or should not be returned to the home of his parents; and
(2) the State had first determined (A) that there exists with respect to the child a specific factor or condition (such as his ethnic background, age, or membership in a minority or sibling group, or the presence of factors such as medical conditions or physical, mental, or emotional handicaps) because of which it is reasonable to conclude that such child cannot be placed with adoptive parents without providing adoption assistance under this section or medical assistance under subchapter XIX of this chapter, and (B) that, except where it would be against the best interests of the child because of such factors as the existence of significant emotional ties with prospective adoptive parents while in the care of such parents as a foster child, a reasonable, but unsuccessful, effort has been made to place the child with appropriate adoptive parents without providing adoption assistance under this section or medical assistance under subchapter XIX of this chapter.   (Emphasis added.)

2.  The adoption date was established by Laws' testimony.   Admin.  Hrg. R. at 580.

of 1998, because G.L. would be six in December of 1998.

¶ 9 After an administrative hearing before an ALJ and review, the State denied Laws' request for adoption assistance at the foster parents' level of assistance as of G.L.'s sixth birthday because the pre-April 19, 1999, payment schedule differentiated between foster parent assistance and adoptive parent assistance, with the former at a higher level of payment. The State justified this result by reference to the statutory language requiring that adoption assistance not exceed foster parent assistance set out in Section 7510–1.5(A), quoted above.

¶ 10 There are, in this matter, three periods of time involved due to regulation changes made by the State. These periods are: (a) pre-April 14, 1999, going back to G.L.'s sixth birthday on December 9, 1998; (b) April 14, 1999, when regulatory changes were made, to October 18, 1999, when additional regulatory changes were made on October 19, 1999; and, (c) October 19, 1999, to December 31, 1999. Laws began receiving the maximum assistance available on January 1, 2000. The trial court, after review of the DHS ALJ's finding, reversed the State's administrative ruling in part by directing that Laws receive that maximum retroactively for the period back to October 19, 1999.[3]

¶ 11 The State amended the regulations on April 14, 1999, to add two levels of payments for adoption assistance. However, these new levels were available only to children who were qualified for Social Security supplemental income (SSI) and who were adopted by a special class of licensed foster parents.[4] The administrative ruling held that Laws failed to qualify under either part of the regulation.[5]

The ruling further stated that the regulation was not a condition on receipt of adoption assistance, but rather a set of criteria for a specific rate of payment.[6] Laws does not dispute that factually she did not qualify under the regulation, but asserts that the scheme was a continuation of the differentiation between foster parent assistance and adoptive parent assistance, and therefore unlawful as an impediment to her right to negotiate for the higher level of assistance. This assertion then represents the second issue of this case.

¶ 12 The regulations were again amended effective October 19, 1999, with the effect of removing the differentiation between adoptive and foster parents. Laws was approved for payments assistance under these revised regulations, effective January 1, 2000. The State denied assistance prior to that time on the ground of ineligibility, stating that G.L. had not been approved for services through DDSD.[7]

¶ 13 The District Court affirmed the administrative ruling denying her benefits up to October 18, 1999. The District Court, on appeal, also ruled that payment to Laws should be retroactive to the amendment on October 19, 1999. The State appeals the retroactive ruling.

STANDARD OF REVIEW

■ ¶ 14 The appellate court has the plenary, independent, and nondeferential authority to reexamine a trial court's legal rulings. *Neil Acquisition, L.L.C. v. Wingrod Investment Corp.*, 1996 OK 125, 932 P.2d 1100 n. 1. Matters involving legislative intent present questions of law which are examined independently and without deference to the

3. Chronology taken from Decision Letter, Director of DHS, dated August 28, 2000. Record p. 534, 537–39.

4. The regulation in effect from April 14, 1999, to October 18, 1999, provided for assistance if:

   i. The child is SSI eligible and approved by DDSD (Developmental Disabilities Services Division) to receive Specialized Foster Care through the Home and Community Based Waiver Services (HCBWS) at the time the adoption is initiated and the time the adoption is finalized.

   ii. The child is adopted by his or her HCBWS specialized foster parent, who at the time of the adoption is certified by DDSD and has a current contract for HCBWS with the Oklahoma Health Care Authority (OHCA).

   OAC 340:75–15–128(b)(2)(D), effective from April 19, 1999, to October 18, 1999.

5. Decision Letter, Director of DHS, dated August 28, 2000. Record 534, 538–39.

6. *Id.*

7. *Id.*

trial court's ruling. *Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991); *Keizor v. Sand Springs Ry. Co.,* 1993 OK CIV APP 98, ¶ 5, 861 P.2d 326, 328. The appellate court will review *de novo* an administrative agency's interpretation of a statute. *Oklahoma Employment Security Comm'n v. Oklahoma Merit Protection Comm'n,* 1995 OK CIV APP 76, ¶ 5, 900 P.2d 470, 473.

¶ 15 When construing a statute the fundamental rule is to give effect to the legislature's intent and purpose of the legislation. *May v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 84 F.3d 1342, 1348 (10th Cir.1996); *Samson Hydrocarbons Co. v. Oklahoma Tax Comm'n,* 1998 OK 82, ¶ 7, 976 P.2d 532, 535. Courts will seek to construe a statute in light of its general policy and purpose and to give effect to the policy and purpose of the statute. *Nealis v. Baird,* 1999 OK 98, ¶ 55, 996 P.2d 438, 460. Thus, the courts construe statutes "in order to champion the broad public policy purposes that underlie them." *Haggard v. Haggard,* 1998 OK 124, ¶ 12, 975 P.2d 439, 442.

## ANALYSIS AND REVIEW

### First Issue—Different Payment Schemes: Adoptive Parents and Foster Parents

¶ 16 This Court notes and determines that the provision of 42 U.S.C. § 673(a)(3) limiting assistance to no more than that sum provided to foster parents is not a license to discriminate against adoptive parents. Adoptive parents are entitled under the Act to *negotiate* for an amount of assistance up to, but not in excess of, that amount of assistance available to foster parents. Here, the State arbitrarily and without authority, limited adoptive parents to an amount less than that provided to foster parents. The State's administrative ruling, and the trial court's affirmance thereof, are contrary to the statutory language and erroneous.

¶ 17 The error under review while narrow in scope nonetheless has consequences upon the adoptive family. The State *may* indeed pay less to an adoptive parent than to a foster parent because individual cases may

and do vary as the needs of each individual child vary. However, the crux here is that the State *may not* impose a ceiling different for each class of case, such that the adoptive parent *may never under any circumstances* obtain assistance equal to assistance provided to foster parents.

¶ 18 The legislative history of IV–E states: The amount of the adoption assistance would be agreed upon between the parents and the agency, could not exceed the foster care maintenance payment that would be paid if the child were in a foster family home, and could be readjusted by agreement of the parents and the local agency to reflect any changed circumstances.

1980 U.S.C.C.N. at 1450.

¶ 19 The United States Department of Health and Human Services' Childrens' Bureau (Bureau) administers the federal statute. That agency has published, in question and answer form, its interpretation of the law in the form of a Child Welfare Policy Manual (Manual). Such informal interpretations are not entitled to deference, but are of assistance in ascertaining the purpose, policy, and meaning of a statute. *Hunnicutt v. Hawk,* 229 F.3d 997, 999 (10th Cir.2000).

¶ 20 The Bureau recognizes that the Act establishes that the amount of assistance in an individual case based upon needs of the child and family circumstances after negotiation between parents and the local agency. *Manual,* 8.2D.4 (Question 1). The specific interpretation given by the Bureau states:

Q. Please explain how the State agency should set rates for title IV–E adoption assistance payments.

A. The amount of the adoption assistance payment cannot exceed the amount the child would have received if s/he had been in a foster family home, *but otherwise must be determined through agreement between the adoptive parents and the State or local title IV–E agency. Unlike other public assistance programs in the Social Security Act, the title IV–E adoption assistance program is intended to encourage an action that will be a life-long social benefit to certain children and not to meet short-term monetary*

*needs during a crisis. Further, the adoptive parents' income is not relevant to the child's eligibility for the program. Title IV–E adoption assistance is not based upon a standard schedule of itemized needs and countable income. Instead, the amount of the adoption assistance payment is determined through the discussion and negotiation process between the adoptive parents and a representative of the State agency based upon the needs of the child and the circumstances of the family. The payment that is agreed upon should combine with the parents' resources to cover the ordinary and special needs of the child projected over an extended period of time and should cover anticipated needs, e.g., child care. Anticipation and discussion of these needs are part of the negotiation of the amount of the adoption assistance payment.*

Manual, 8.2D.4 (Question 1). (Emphasis added.)

Q. Some State's foster care rate structures are based on levels of care. How would such a rate structure impact (sic) the adoption assistance rates?

A. If a State's foster care payment schedule includes higher level-of-care rates that are paid across-the-board for certain children, the State may pay up to that amount in adoption assistance if that specific child would have received the higher level-of-care rate in foster care.

Manual, 8.2D.4 (Question 5).

¶ 21 The fatal flaw in the pre-October 1999 limitation imposed by the State is that the limitation artificially frustrates the purpose of the Act *"to encourage an action that will be a lifelong social benefit to certain children"* and to do so *"through the discussion*

*and negotiation process"* so as to meet the needs of the child and to consider the family circumstances. Here, the State has not demonstrated any basis whatsoever to justify its decision to place a cap on assistance to adoptive parents other than the maximum tied to foster care payments.

¶ 22 This Court emphasizes and recognizes that payment of the maximum is obviously not automatically required in every case. The purpose of the IV–E Program is to encourage adoption of special needs children by providing assistance to alleviate the financial burdens associated with the special needs of the children. Only the individual needs of the child and circumstances of the family govern the limits, subject to the cap, of that assistance.

¶ 23 Moreover, unlike other subsidy laws, here there is no means test.[8] "The use of a means test is prohibited in the process of selecting a suitable adoptive family, or in negotiating an adoption assistance agreement, including the amount of the adoption assistance payment." *Manual,* 8.2A.2 (Question 1). The Bureau's prohibition against a means test reinforces this Court's conclusion. The policy is that persons qualified to adopt, and who are willing to adopt a special needs child, shall be entitled to obtain assistance when that child's needs and their circumstances warrant. The policy encourages and supports adoption of special needs children who otherwise might not be adopted simply because of financial burdens.[9] The absence of a means test is further indication that the underlying legislative intent is to make the subsidy available to *all* adoptive parents and in an amount up to the maximum provided by law.

¶ 24 The State's approach, until October 1999, frustrated the purposes of adoption

8. *Manual,* 8.2D.4 (Question 1) concerning setting of rates of subsidy, responds in part,

Unlike other public assistance programs in the Social Security Act, the title IV–E adoption assistance program is intended to encourage an action that will be a lifelong social benefit to certain children and not to meet short-term monetary needs during a crisis. Further, the adoptive parents' income is not relevant to the child's eligibility for the program. Title IV–E adoption assistance is not based upon a stan-

dard schedule of itemized needs and countable income.

9. "The primary goal of the title IV–E adoption assistance program is to provide financial support to families who adopt difficult-to-place children from the public child welfare system. These are children who otherwise would grow up in State foster care systems if a suitable adoptive parent could not be found." *Manual,* 8.2E, (Question 1).

assistance and the policy underlying that purpose. Hence, the State's actions in establishing a two-tier system were not in conformity to the federal law and unlawful.

¶ 25 Moreover, the State's approach finds no support in Oklahoma law as set out in the Statute. Section 7510–1.5, set out above, directs that adoption subsidies be based on needs of the child, without exceeding the foster care subsidy. 10 O.S.2001, § 7510–1.5(A).

¶ 26 The State in support of its position cites two Louisiana Court of Appeals cases. The first, *In re Martorana,* 619 So.2d 1121 (La.App.1993), presented a situation in which the Louisiana Department of Health and Human Resources promulgated a program manual providing for assistance up to eighty percent of foster care payments. The Louisiana legislature had established, by state law, an assistance program in response to federal law. The state act provided that payments may vary depending upon needs, but could not exceed the costs of foster care. *Id.* at 1122.

¶ 27 The Louisiana Court of Appeals upheld their agency's eighty percent rule. In so doing, the Court limited its review to state law, particularly guided by the state's budgetary analysis argument. *Id.* at 1123. In light of the absence of application by that court of the federal law, this Court finds *Martorana* not to be persuasive.

¶ 28 The second case, *In re B.M.,* 787 So.2d 331 (La.App.2001), involved a situation in which the trial court had ordered an adoption subsidy of $1,200.00 *plus* one hundred percent of the foster care rate. Thus, the payment subsidy ordered exceeded the maximum foster care assistance. Moreover, the subsidy offered by the state agency while the child was in foster care had been agreed to by the foster parent, who was also the prospective adoptive parent. This case wholly fails to provide the State authority to establish an artificial barrier to negotiation for the

full foster care assistance amount as an adoption subsidy.[10]

### The Regulatory Barrier—April 19, 1999 to October 18, 1999

¶ 29 During this time period, the State regulations established two criteria: (1) SSI eligibility and approval by the Developmental Difficulties Service Division, (DDSD), to receive Specialized Foster Care through the Home and Community Based Waiver Service, (HCBWS), at the time the adoption is initiated and the time the adoption is finalized; and, (2) adoption by a special class of foster parent.

¶ 30 The State's reliance upon the first criterion to deny assistance operates as a denial of assistance because of a regulation *not* in effect when Laws made her adoption application in 1998. It does not appear that Laws was afforded any opportunity to qualify after the regulation was promulgated. Moreover, it appears highly unusual that the State would seek to apply a rule applicable on its face to adoption cases in their inception whereas Laws' adoption had been finalized January 1, 1999, some four months prior to the effective date of the regulation. Finally, the record here shows that G.L., as a foster child, had qualified for DDSD services.

¶ 31 The second requirement dealing with foster parent(s) clearly restricts adoption subsidies to a special class of persons. The State has failed to demonstrate authority or need for this special classification, especially in light of a complete absence of or even an implication of such authority in the federal Act. Moreover, the classification frustrates the purposes of the Act to encourage adoption of special needs children by limiting to a special class the opportunity to negotiate for a maximum assistance.

¶ 32 The provision of the regulation giving preference to a specific class of foster parents not only fails to find support in the Oklahoma Statutes, but also is contrary to the provisions of Section 7510–1.4(B).[11] This

---

10. This case recognizes the negotiable nature of payments. The State, while here citing the case with approval, has apparently failed to implement that which it therein approves—enlightened negotiation.

11. Section 7510–1.4 of Title 10 then provided in part:
    A. Whenever significant emotional ties have been established between a child and his foster parent or parents, and the foster parent or

subsection provides that a child will be eligible for subsidy when adopted by parents other than foster parents. The State's application of the regulation to Laws precluded her from qualifying G.L. for permitted subsidy assistance apparently because she had not been a member of the special class of foster parents. Subsection B recognizes that not every special needs child will be adopted by the class of foster parents specified in the regulation. Thus, the trial court erred in failing to reverse the State's Administrative decision and not recognizing Laws' right to negotiate within the statutory limits on the amount of assistance available.

### Retroactive Qualification Post– October 19, 1999

■ ¶ 33 The State has appealed the trial court's retroactive grant of services from October 19, 1999. For the reasons set out in subsequent paragraphs, that decision is affirmed.

¶ 34 Laws has qualified for assistance under the regulations promulgated after October 19, 1999. The two-tier scheme was removed, but eligibility requirements existed. The three requirements in issue here are: (a) G.L. must be determined to be retarded; (2) G.L. must meet level of care requirements; and (3) DDSD must establish a written plan of care to receive HCBWS. The State, in defense, argues that assistance to G.L. was not available until January 2000, because the last requirement was not completed until that time.

¶ 35 Hence, the issue is whether the trial court erred by making the qualification retroactive to October 19, 1999. The simple fact is that G.L., as a foster child, had already met the first two of these requirements prior to 1998 when G.L. had his sixth birthday. Any plan deemed appropriate as a prerequisite for those services either was, or could have been, established then.

¶ 36 Moreover, Laws had established her claim well prior to January 1, 2000. The trial court did not err by making the qualification retroactive and that portion of the decision is affirmed.

### CONCLUSION

¶ 37 Even though the trial court did not err by deciding to make the adoption assistance retroactive to October 19, 1999, the court did err in its decision not to afford Laws the opportunity to negotiate for assistance at the maximum foster care rate beginning on G.L.'s sixth birthday up to that date. The pre-October 1999 problem was that a two-tiered scheme prevented Laws from negotiating for the maximum foster care assistance. As determined here, that scheme was unlawful.

¶ 38 However, this leaves unresolved the amount of assistance from G.L.'s sixth birthday up to October 19, 1999. The amount, determined by negotiation, involves facts concerning G.L.'s needs and Laws' circumstances, all of which are not determined in the record here. Therefore, this Court reverses the trial court's decision to deny to Laws negotiation of assistance from G.L.'s sixth birthday to October 19, 1999.

¶ 39 This Court remands this case to the trial court with instructions to the trial court to direct the State to negotiate a rate of assistance with Laws in an amount not to exceed the maximum foster parent assistance from and after the time of G.L.'s sixth birthday to October 19, 1999, with due speed.

¶ 40 AFFIRMED IN PART AND REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.

GOODMAN, P.J., and REIF, J., concur.

---

parents seek to adopt the child, the child may be certified as eligible for an adoption maintenance subsidy conditioned upon adoption of the child under applicable adoption procedures by the foster parent or parents.

B. In all other cases, after reasonable efforts have been made and no appropriate adoptive family without the use of subsidy has been found for a child, the Department of Human Services shall certify the child as eligible for a subsidy in the event of adoption.